ROBERT BAXTER, PLAINTIFF-RESPONDENT, v. FAIRMONT FOOD CO., *ET AL.*, DEFENDANTS-APPELLANTS.

Argued May 24, 1977—Decided October 21, 1977.

*Mr. Richard D. Bennett* argued the cause for defendant-appellant Fairmont Food Co. (*Messrs. Bennett & Bennett,* attorneys).

*Mr. Francis Sorin* argued the cause for plaintiff-respondent.

The opinion of the court was delivered by

HUGHES, C. J. This appeal projects again the sometimes troublesome question of the extent and nature of judicial power, whether that of a trial or appellate court, to overrule a jury verdict, not on the basis of trial error on questions of law, but because of claimed discordance between the verdict and the evidence on which it was based.

We consider here a ruling by the Appellate Division which (1) vacated a *remittitur* as to damages, ordered by the trial court and accepted by plaintiff, and (2) reinstated the jury verdict fixing damages at $300,000. We believe that Appellate Division action was eminently correct, and so we affirm its decision.

The issue arose in this way. Plaintiff, a motorcyclist, sustained severe injuries in an intersectional collision with defendants' truck, allegedly operated illegally and negligently through a red light. The first trial resulted in a verdict for the plaintiff, found, on motion, to be so manifestly inadequate as to represent a compromise verdict; hence a new trial as to liability and damages was ordered. At the second trial plaintiff again prevailed as to liability and was awarded damages of $300,000. Defendant then moved for a new trial as to both liability and damages or, in the alternative, for a *remittitur* of damages. While upholding the verdict as to liability, the trial court reduced the award to $150,000 with the proviso that if plaintiff, in writing, accepted the reduced amount within ten days, defendant's motion for new trial would be denied. If plaintiff did not accept the reduced judgment, the motion for a new trial would be deemed granted, limited to the issue of dam-

ages. Plaintiff accepted the reduced judgment. Defendant filed an appeal from the judgment as reduced. Plaintiff then cross-appealed from the *remittitur* ordered by the trial court.

The Appellate Division found no merit in any of the defendant's contentions as to trial error. However, on plaintiff's cross-appeal, after reviewing the extent of his very serious injuries, it concluded that the trial court had mistakenly exercised its discretion in granting defendant's motion for a *remittitur* and in so doing had improperly invaded the province of the jury. Accordingly, as noted, it vacated the *remittitur* and reinstated the jury verdict fixing damages at $300,000. This Court granted defendant's petition for certification solely as to the issue of the validity of the Appellate Division's reinstatement of the jury verdict as to damages.

 Simplification of the issue might be aided by stating and separating factors on which there is no dispute. We have no misgivings about the *remittitur* practice, long in effect in this jurisdiction, and increasingly valuable to the modern administration of justice, confronted as the courts are today by unprecedented litigation caseloads.[1] As urged by Justice Proctor in *Fritsche v. Westinghouse Electric Corp.,* 55 *N. J.* 322, 330–31 (1970), the practice should be encouraged at both trial and appellate levels to avoid the unnecessary expense and delay of new trial. Moreover, plaintiff's initial acceptance of the *remittitur* is not significant. Had defendant bowed to its conditional mandate, that acceptance would have been effective. But once it was challenged by defendant's appeal, the law properly reverts the parties to "square one" and no significance, as though by

[1]Never in history have New Jersey courts been forced to cope with such a volume of litigation. At August 31, 1977 the State court system (exclusive of municipal courts) faced 167,811 cases; at the same date in 1976, 153,651 cases; at the same date in 1967, 92,333 cases; at the same date in 1957, 39,153 cases, and on the opening day of the new court system created by the 1947 Constitution, September 15, 1948, the State court system confronted 11,377 cases.

some sort of quasi-admission, attaches to the *remittitur* acceptance by plaintiff. *Mulkerin v. Somerset Tire Service, Inc.,* 110 *N. J. Super.* 173 (App. Div. 1970).

Similarly, the norms dealing with trial court supervision of jury response, specifically its review of a jury's assessment of damages, are clearly set forth in *Taweel v. Starn's Shoprite Supermarket,* 58 *N. J.* 227 (1971). Recently, we had occasion to restate the test to be applied by a trial court where a *remittitur* of the jury award of damages is sought. In essence, it is that a trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injury and resulting disability shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust. *Sweeney v. Pruyne,* 67 *N. J.* 314, 315 (1975). Put in another way, the judge cannot validly intrude unless "it clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a). Except in one respect to be mentioned later, the basic criteria for appellate court intervention are not significantly different. One such was simply phrased for this Court by Justice Hall (in reversing a trial court denial of a new trial motion) as follows:

We are satisfied beyond any doubt that the verdict was against the weight of the evidence so as to constitute a miscarriage of justice * * *. [*Dolson v. Anastasia,* 55 *N. J.* 2, 12 (1969)].

As pertaining to damage awards, Justice Proctor cautioned in *Fritsche* that "[v]erdicts should be upset for excessiveness only in clear cases." 55 *N. J.* at 330.

While sometimes difficult of application to a given factual base, these rules recognize that all judges, whether trial or appellate, are human and that the judgment of each is inevitably affected by subjective prejudices or predispositions relating to properties or specific tendencies of the individual mind, as distinguished from general or universal experience. These natural subjective inclinations derive from the particular background or experience of the individual

judge, whether from tenure on the bench in examining or recalling other cases, from previous activity in law practice in diverse fields or, for that matter, from any human experience, such as a youthful background of poverty or wealth or the like. Such individuality of approach extends of course to the field of admeasuring damages flowing from injuries caused by negligence, as in the present case, or other wrong. It is for the merging of such individualized propensities of mind[2] into an amalgam of common judicial experience related to the doing of justice that judges are admonished to resist the natural temptation to substitute their judgment for that of the jury. *See Dolson v. Anastasia, supra,* 55 *N. J.* at 6; *Mulkerin v. Somerset Tire Service, Inc., supra,* 110 *N. J. Super.* at 178; *Andryishyn v. Ballinger,* 61 *N. J. Super.* 386, 395 (App. Div.), certif. den., 33 *N. J.* 120 (1960).

The judgment of the initial factfinder then, whether it be a jury, as here, or a judge as in a non-jury case (*see Leimgruber v. Claridge Assoc.,* 73 *N. J.* 450, 455–56 (1977); *Rova Farms Resort v. Investors Ins. Co.,* 65 *N. J.* 474, 483–84 (1974); *State v. Johnson,* 42 *N. J.* 146, 162 (1964); *National Institute for Rehab. Engineering v. Fenton,* 146 *N. J. Super.* 434, 436 (App. Div. 1976); *Greenfield v. Dusseault,* 60 *N. J. Super.* 436, 444 (App. Div.), *aff'd o. b.,* 33 *N. J.* 78 (1960)) is entitled to very considerable respect. It should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the

---

[2]"The great tides and currents which engulf the rest of men do not turn aside in their course and pass the judges by." B. Cardozo, The Nature of the Judicial Process 168 (1921).

"For the highest exercise of judicial duty is to subordinate one's personal pulls and one's private views to the law of which we are all guardians — those impersonal convictions that make a society a civilized community, and not the victims of personal rule." Felix Frankfurter, in Clark, Tom C., "Mr. Justice Frankfurter: 'A Heritage for All Who Love the Law,'" 51 *A. B. A. J.* 330, 332 (1965).

judgment would constitute a manifest denial of justice. The process of "weighing" the evidence is not to encourage the judge to "evaluate the evidence as would a jury to ascertain in whose favor the evidence preponderates" (*Kulbacki v. Sobchinsky*, 38 *N. J.* 435, 455 (1962) (Haneman, J., concurring) and on that basis to decide upon disruption of the jury's finding. "[T]he judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror." *Dolson v. Anastasia, supra,* 55 *N. J.* at 6. Nevertheless, the process of evidence evaluation called "weighing" is not "a *pro forma* exercise, but calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury." *Id.* It is only upon the predicate of a determination that there has been a manifest miscarriage of justice, that corrective judicial action is warranted.

██ ██ The comparative strictness of these rules is historic in nature, with roots deep in the common law. In the American system of justice the presumption of correctness of a verdict by a jury has behind it the wisdom of centuries of common law merged into our constitutional framework. Of course such verdict is not sacrosanct and can never survive if it amounts, manifestly, to a miscarriage of justice. The resolution of this latter question is reposed in the courts. Respect for our constitutional system requires that this obligation be approached, in all contingencies, with utmost circumspection, lest the courts intrude upon responsibilities which have traditionally, intentionally and constitutionally been vested in a jury of citizens.

██ ██ To us all of this means that a trial judge, before acting in derogation of the jury's fixing of damages, must be convinced, and that very clearly, of something like this: "This verdict is terribly wrong — having canvassed the record I reach this conclusion because of substantive factors in the totality of the evidence [*e. g.,* the incredible testimony offered by a party, the overwhelm-

ing weight of the evidence with respect to a certain fact, the failure of a party to produce any countervailing medical or other expert testimony, etc.] — and I must therefore determine that it is so much against the weight of the evidence as to be, manifestly, a miscarriage of justice." The trial judge having acted and that action coming on for review on appeal, we think the appellate court must be concerned with the same norm of decision, since that is basic to its ultimate conclusion as to whether justice has miscarried by dint of the trial judge's invasion of the jury's province, where he was not justified in doing so.

 The pervading sense of "wrongness" needed to justify appellate or trial judge undoing of a jury verdict was adverted to by Justice Hall in *State v. Johnson, supra*:

> While this feeling of "wrongness" is difficult to define, because it involves the reaction of trained judges in the light of their judicial and human experience, it can well be said that that which must exist in the reviewing mind is a definite conviction that the judge [the jury] went so wide of the mark, a mistake must have been made. This sense of "wrongness" can arise in numerous ways — from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, a clearly unjust result, and many others. [42 *N. J.* at 162].

We perceive no reference to any of these specifics in the stated reason for the present *remittitur*. The judge ordering that *remittitur* was of course bound by the stricture of *Taweel*:

> A trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injuries and resulting disabilities shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust. In making its overview, a court must accept the medical evidence in the most favorable light to the plaintiffs; it must accept the conclusion that the jury believed the plaintiffs' injury claims and the testimony of their supporting witness, and if, tested on such bases, the verdict (even if generous) has reasonable support in the record, the jury's evaluation should be regarded as final. [58 *N. J.* at 236].

It must be acknowledged, to be sure, that the trial judge has one advantage over the appellate court. That court depends upon the cold record, whereas he has also what is called the "feel of the case." *Fritsche v. Westinghouse Electric Corp., supra; Dolson v. Anastasia, supra.* But where the record is extensive and plaintiff's evidence largely uncontradicted, where no exaggeration or malingering is apparent, mentioned or implied in that record, where no countervailing medical evidence was offered by defendant, as here, the "feel of the case" factor is minimal and plainly based only upon the trial judge's view of the disfigured and crippled body of the plaintiff, and upon his subjective feeling as to the worth in money of the ordeal of suffering with that damaged body for a lifetime, which value this particular judge fixed at $150,000. It may be noted that at one point in the trial, plaintiff was permitted to demonstrate to the jury his difficulty in walking. It therefore had an equal opportunity with the trial judge to view and consider that damaged body and its permanent limitations.

The "feel of the case" factor, while entitled to deference, is the only element distinguishing the standard governing appellate review from that controlling trial court reaction to a jury verdict. And as stated by Justice Hall in *Dolson,* the trial judge's decision

is not entitled to any special deference where it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record with respect to which he is no more peculiarly situated to decide than the appellate court. [55 *N. J.* at 7].

So it was that in *Dolson,* Justice Hall adjured the trial judges in deciding new trial motions "to spell out fully the reasons for their determinations so that reviewing tribunals may be advised of the extent to which factors entitled to deference entered into the decision." *Id.* at 7–8. As we have indicated, nothing of that nature is perceptible in the stated rationale of the trial court action under review.

No challenge to the plaintiff's credibility was suggested (the trial judge in fact, on another branch of the case, commented favorably on that credibility). No inconsistency was noted, as though testimonial description of a catastrophic residual disability was belied by the appearance before the court of an apparently hale and hearty plaintiff. Nor was there mentioned any proof of intervening physical activities on his part incompatible with the extensive permanent disability proven. No imbalance or doubt as to the disability evidence was said to be suggested by the record. Nor was there otherwise any spelling out of tangible findings on which might be erected any superior "feel of the case" element which ought be entitled to the "deference" mentioned by Justice Hall in *Dolson.*

It is true that the trial judge mentioned, as to the size of the verdict, that he was "shocked" (a word sometimes used to express surprise or unexpectedness, as well as "shock" in the sense of frustration or revulsion). He thought the verdict "very large" and "far from the mark"; that "mark" presumably being what he would have deemed, had he served on the jury, a verdict reasonable in amount. From all of this he thought he saw a disproportion so gross, between disability and award, as to brand the latter as manifestly unjust. We are now bound to seek the basis for this conclusion, and so far as we have gone, it continues to elude us.

Careful consideration of the stated *ratio decidendi* for this *remittitur* discloses nothing beyond the above subjective conclusions, wholly unsupported by a statement of factual base or objective elements of any kind. *Cf. Leimgruber v. Claridge Assoc., supra.* Apart from the inner feelings of the trial court as to the conclusion which he felt the jury ought to have reached, or that he would have reached in its place, the record is uninformative as to any "feel of the case" factor other than his view of the plaintiff's body. Even as to that, his silence concerning it would indicate that if it was a factor in his reasoning, it was surely *de minimis.*

■ This brings us to the actual record of the case as to which, for the above reasons, the appellate court and trial judge are now on almost even footing for the fulfillment of obligation concerning the disruption of a jury verdict—a verdict, incidentally, untainted by any error beyond its claimed excessiveness. On 'this scale must then be added the caution insisted upon, by precedent and rule of court, before any court, trial or appellate, ought nullify a jury finding. The "tangible considerations apparent from the face of the record" (*Dolson, supra*), in the light of which we must decide the terminal question, include the following.

· Plaintiff was 17 years old at the time of his accident, and suffered a permanent disability to his left leg. He now has a decided limp; the leg is bowed and shortened. He experiences considerable pain when he walks on it. He is incapacitated for any kind of strenuous physical activity. The record discloses further significant detail. In addition to relatively inconsequential injuries (abrasion of right hand, simple fracture of talus of left foot) and the pain incident to a very violent traumatic injury, the permanent injury inflicted here was most serious. The record amply supports this analysis by the Appellate Division:

In this case plaintiff's damage proofs were undisputed; defendant introduced no medical evidence although plaintiff was examined on behalf of defendant by a doctor of its choice. The evidence disclosed that the accident left plaintiff with a permanent, deforming, and constantly painful injury to his left leg. The multiple comminuted compound fractures of the left upper tibia and fibula, the subject of three separate surgical procedures, never healed; bony union was not achieved despite the insertion of pins designed to correct the condition. The left leg bowed below the knee and is one inch shorter than the right leg. As a result, his pelvis is tilted. Because of the nonunion of the fractured bones, weight bearing is painful; plaintiff can only walk using the outer aspect of his left foot and therefore limps to a considerable degree. Plaintiff's doctor testified that each step constitutes additional trauma to the leg; the pain is constant and permanent; nothing further can be done to correct the condition and plaintiff must learn to live with 'it.

At the time of the accident, plaintiff was only 17 years old, with a stipulated life expectancy of over 48 years. Medical expenses ex-

ceeded $5,800; he was unable to obtain certain jobs because of his disability and finally obtained a sedentary job while he attended college. All athletics, with the exception of swimming, are beyond his present capabilities.

To this graphic description might be added the evidence that because of what was described as the "change of the chemistry of bone formation that prevents it from knitting properly" the weight of plaintiff's body is supported by the ligaments of the left leg rather than the ineffective bone structure, and that because of the shortened leg and tilted pelvis "his equilibrium is off" and "he loses balance."

This sobering condition, uncontroverted in the record, presents a ponderous question for judgment, better left as we have seen to the decision of a jury — a decision impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice.

Moreover, this serious disability, with its limitation of motion, its crippling disfigurement, its impact on normal employment, social and athletic activities and its pain experienced daily, is expected to subsist for a lifetime of almost a half century. The whole factual base led the Appellate Division to determine:

> There is no question that the injury in question will have a substantial impact on plaintiff's future life. In light of these uncontradicted proofs, and making due allowance for the trial judge's "feel of the case," we conclude that he mistakenly exercised his discretion in granting defendant's motion for a *remittitur* and in so doing invaded the province of the jury. The award, although admittedly generous, was not so disproportionate to the injuries and resulting disabilities shown as to shock the conscience of this court; sustaining the jury award will not, in our view, result in manifest injustice to defendant.

We agree. Setting aside the subjective view of a judge (or a reviewing court) as to the amount he or it would have awarded if he or it had been the jury, we, like the Appellate Division, are totally unable to conclude that the jury

verdict of $300,000 in damages in this grievous case was "so disproportionate to the injury and resulting disability as to shock the conscience and [convince the court] that to sustain the award would be manifestly unjust." Nor to believe that "it clearly and convincingly appears that there was a miscarriage of justice under the law."

To the contrary. Upon the whole evidential record, we consider this verdict well within the range of permissible jury decision with which neither the trial court, nor this Court, ought to interfere.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.