**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4524-15T2

TOMIKIA DAVIS, by and
through CHARLENE DAVIS,
Limited Administrator of the
ESTATE OF TOMIKIA DAVIS,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

DR. ABBAS HUSAIN,

      Defendant-Appellant/
      Cross-Respondent.

_____

Argued December 5, 2018 – Decided March 1, 2019

Before Judges Alvarez, Reisner, and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-5893-07.

Robert J. Hagerty argued the cause for appellant/cross-respondent (Hagerty & Bland-Tull Law LLC, attorneys; Robert J. Hagerty, on the briefs).

Deborah L. Mains argued the cause for respondent/cross-appellant (Costello & Mains, LLC, attorneys; Deborah L. Mains, on the brief).

PER CURIAM

Defendant Abbas Husain appeals from the March 18, 2016 denial of his motion for a new trial after a hearing conducted pursuant to a Supreme Court remand. We reverse.

The underlying facts bear brief mention. In 2005 and 2006, Tomikia Davis[1] was employed part-time in Husain's medical office. A jury agreed in 2011 that Husain created a hostile work environment, sexually harassed Davis, and retaliated against her during her employment. See Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. She was awarded $12,500 in damages. The trial judge granted Davis's counsel $102,962.63 in fees.

After the trial, the judge met ex parte with the jury. Afterwards, he informed counsel that a female juror mentioned that Husain had not placed his hand on the Bible when taking the oath. The judge declined to make a further inquiry regarding this, or to grant a new trial.

---

[1] While the matter was pending, Davis passed away. The substituted plaintiff is "Tomikia Davis, by and through Charlene Davis, Limited Administrator of the Estate of Tomikia Davis." We will refer to plaintiff only as Davis.

The ensuing appeals resulted in the Supreme Court's decision flatly "prohibiting ex parte post-verdict communications between trial judge and jurors." Davis v. Husain, 220 N.J. 270, 288 (2014). The Court directed on remand that a different trial judge "consider afresh the import of the juror's observation and comment, along with all other relevant factors bearing on whether a Rule 1:16-1 factual inquiry is warranted." Ibid. The Court further directed that "on remand [the trial judge] will engage in a practical and efficient means of illuminating the murky facts that have been presented on appeal." Ibid. Finally, the trial judge was to determine if the juror's "actions or comments" affected others on the panel. Ibid. The focus of the inquiry would be whether a "good cause showing [was] made that the jury's decision was tainted by misconduct." Id. at 286.

Husain appealed directly to the Supreme Court from the initial decision post-remand that no new trial was warranted. The Court again remanded the matter, requiring the judge to interview the four female jurors on the panel to attempt to identify who made the statement and thereafter decide whether a Rule 1:16-1 inquiry was required.

The Law Division judge then conducted a hearing pursuant to the Court's directive. A single juror appeared; court staff had sent ordinary mail notices to

all the female jurors. The judge found that two of the envelopes came back, marked "return to sender." The other two notices were not returned.

Once the juror who responded was seated in the courtroom, the Law Division judge asked her if she spoke with the trial judge regarding Husain's manner of taking the oath. She had not. The juror did not recall anyone mentioning that to the judge, but she remembered someone speaking to a "court aide" about it. She said that "maybe" she overheard the conversation, stating that the court aide asked about the outcome of the jury's deliberations, and the reason they reached their verdict. The juror did not recall how many jurors spoke to the court aide.

The judge asked the juror if anyone mentioned "whether or not [] Husain could have or should have or didn't take any type of oath or put his hand on the Bible? Anything like that?" She responded that during deliberations one of the two African-American jurors, although she did not remember which one, mentioned it. The judge asked if she had "any sense at all what the reaction of the other jurors was at that time to that comment by the other juror concerning [] Husain, and maybe he didn't take the oath and that type of thing?" The juror replied:

> [Juror]: From what I can remember, I remember one particular woman was very passionate

A-4524-15T2

about the fact that that didn't happen, but I don't think that the rest of the jury really put too much stock into it. I think our decision was based on factors outside of that. From the discussion that we had, that's what I could tell.

THE COURT: When you said the one juror was very passionate about it, are you talking about the African[-]American juror that noted that [] Husain didn't put his hand?

[Juror]: Yes.

THE COURT: All right. Very good. All right. Counsel want to approach?

(Sidebar commences at 11:25 a.m.)

THE COURT: I'd like anybody's comments, but I'm not inclined to turn this into a discovery deposition. Does anybody have anything that they think I glaringly overlooked?

[Defense counsel]: Well, I won't characterize it as glaringly overlooked, but she -- all she's told us is that one juror was passionate about it. If we can find out what that means, how many times did she say it, or how did she say it?

THE COURT: What's your position on that?

[Plaintiff's counsel]: You know, I'm okay with having those questions asked, Judge. I mean, I guess we could just ask one more time. You know? She's already said her sense of it, you know, the jurors really weren't putting any weight on it. If we could just get that --

THE COURT: All right.

[Plaintiff's counsel]: -- you know, clarify that with her.

THE COURT: Very good. All right.

(Sidebar concludes at 11:26 a.m.)

THE COURT: All right. When you said the African[-]American juror was very passionate about her belief, could you give us any added details to that?

[Juror]: Well, we were talking about the facts of the case, the different things that happened, and we -- you know, oh, and this happened and that happened, and oh, he didn't even put his hand on the Bible when he testified I guess is the right word. It was just -- it was more, I guess, the way she said it, that it wasn't just like, oh, yeah, and this. It was different.

THE COURT: All right. And when you said the other jurors didn't give her much credence, that's -- but that appeared to be what you were saying? Can you give us any more details on that?

[Juror]: I don't know what I'm allowed to -- like, am I allowed to say, like, what we talked about in there? Should I say? I don't really --

THE COURT: That's actually a good point. The answer is no. But -- but did the other -- did it appear to you that any of the jurors were as concerned with that African[-]American juror that [] Husain did not put his hand on the Bible?

[Juror]: No.

6

THE COURT: All right. Did anybody verbally, in giving their opinion about the case, other than the African[-]American juror that you've indicated, indicate that [] Husain's not putting his hand on the <u>Bible</u> was a reason for questioning [] Husain's believability?

[Juror]: No, I don't think so. It was a while ago, but I don't think so.

THE COURT: All right. Does counsel want to approach for a second?

(Sidebar commences at 11:27:48 a.m.)

THE COURT: That's as far as I'm inclined to go. Does anybody want to put their concerns or objections on the record? I'm glad to let you do so before I discharge her.

[Plaintiff's counsel]: I'm satisfied, Judge, so I can put that on the record, if you'd like.

[Defense counsel]: Your Honor, I would want more exploration of what she meant by very passionate, but if Your Honor is indicating that you're going to not question further, you know, certainly I would object to that, without the exploration. But --

THE COURT: Fair enough. All right. Very good. Thank you.

[Plaintiff's counsel]: Thanks, Judge.

[Defense counsel]: Thank you.

(Sidebar concludes at 11:28 a.m.)

A-4524-15T2

After the juror left the courtroom, the court and counsel discussed whether the inquiry sufficed. The judge said that he would deny any forthcoming motion for a new trial because in his view jurors commented in similar fashion "all the time" during trials. He reiterated that in his opinion,

> if the juror obviously made racist comments, anti-Semitic comments, anti-Catholic comments, anti-female comments, anti -- those cases are easier cases, those you do get new trials on. But where the juror mistakenly thought that conduct by a party occurred, and when I say mistake, she wasn't mistaken about what she observed --
>
> . . . she was mistaken, it looks like -- I say it looks like -- what religion was [] Husain again?

The judge was told that Husain practiced the Hindu faith. The judge continued:

> She inferred a lack of credibility from [] Husain because [] Husain wouldn't put his hand on the <u>Bible</u>. And aside from that, the only evidence we have is that the other jurors weren't that impressed.
>
> I'll gather from [defense counsel] he'd like me to call every juror back in to ask them to what extent they were impacted by it. I'm not going to quote the cases that generally say don't explore jurors' reasons. If that's what the Supreme Court wants, that's of course what I'll do. But even assuming some of them were influenced by it incorrectly, I don't want to sound hardhearted about it, but my attitude is that's life. We don't get perfection from jurors. That's one of the reasons why you don't ask them how they came to their verdict. We don't want to know.

A-4524-15T2

At the proceeding in which Husain's motion for a new trial was formally denied, the court reiterated that nothing "justif[ied] a new trial." He repeated that in the opinion of the testifying juror, although the juror who observed Husain not place his hand on the Bible was "very passionate" about that, it did not affect other jurors or the deliberations. He ruled that to conclude otherwise would be sheer speculation and that hence there was no basis for a new trial. He analyzed the matter by treating the impassioned juror's concern as if it were no different than any other factors jurors took into account in reaching a decision.

On appeal, Husain argues:

> I. CONTINUING THE EXERCISE OF FINDING AND INTERVIEWING THE JUROR IN QUESTION IS BOTH FUTILE AND POINTLESS AT THIS JUNCTURE. THE ONLY JUST RESULT AT THIS TIME IS TO GRANT DEFENDANT A NEW TRIAL.

By way of cross-appeal, Davis contends:

> [I]. THE TRIAL COURT ABUSED ITS DISCRETION IN SETTING THE LODESTAR FOR ATTORNEYS' FEES AWARDED TO PLAINTIFF FOR TRIAL LEVEL WORK PERFORMED ON REMAND ISSUES IN THIS ACTION.
>
> A. Counsel Provided Ample Support for Our Hourly Rates.
> B. The Trial Court's Ruling.
> C. The Prior Ruling by [the Trial Judge] is Not the Law of the Case Binding on the Fee Award At Issue on this Appeal.

9

> D.    The Trial Court Abused its Discretion by Failing to Apply <u>Rendine</u> to the Fee Application, Warranting Reversal of the Fee Award and Application of the Hourly Rates Sought by Counsel.

We do not reach the cross-appeal, as our decision that Husain is indeed entitled to a new trial makes the issue of counsel fees moot at the present time.

## I.

A trial judge must grant a motion for a new trial if "it clearly and convincingly appears that there was a miscarriage of justice under the law." <u>R.</u> 4:49-1(a); <u>R.</u> 2:10-1.  Because "[t]he judgment of the initial factfinder . . . is entitled to very considerable respect[,]" its decision "should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice." <u>Baxter v. Fairmont Food Co.</u>, 74 N.J. 588, 597-98 (1977) (internal citations omitted).  Thus, a motion for a new trial should only be granted if any decision otherwise "would result in a miscarriage of justice shocking to the conscience of the court." <u>Risko v. Thompson Muller Auto. Grp., Inc.</u>, 206 N.J. 506, 521 (2011) (citing <u>Kulbacki v. Sobchinsky</u>, 38 N.J. 435, 456 (1962)).

A miscarriage of justice exists when a "pervading sense of 'wrongness'" justifies the "undoing of a jury verdict[.]" Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996) (quoting Baxter, 74 N.J. at 599). Generally, a motion for a new trial is left to the sound discretion of the trial court. Ibid. That being said, "such discretionary power cannot be exercised according to whim or caprice so as to be arbitrary, vague or fanciful, but must be governed by established principles of law and reason . . . in order to obtain a just result." Ibid. (citing State v. Bunk, 4 N.J. 482, 485 (1950)).

Moreover, "[t]he standard of review on appeal from decisions on motions for new trial is the same as that governing the trial judge -- whether there was a miscarriage of justice under the law." Risko, 206 N.J. at 522. In reviewing the trial court's ruling, the appellate tribunal must still "defer to the trial court in those areas where the trial court has expertise, or a 'feel of the case,' e.g., the credibility or demeanor of the witnesses." Lindenmuth, 296 N.J. Super. at 49 (citing Thomas v. Toys "R" Us, Inc., 282 N.J. Super. 569, 579 (App. Div. 1995)).

Rule 1:16-1 states: "[e]xcept by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney, interview, examine, or question any . . . petit juror

with respect to any matter relating to the case." An exception to the prohibition exists, however, if good cause is shown that a jury's decision "was tainted by misconduct." This showing includes situations in which a jury is provided with information, not presented in the courtroom, that could be prejudicial to the outcome. It has been said that the "good cause" referenced by the rule is not an impropriety or defect in a juror's motives or methods or thought processes unless it is prejudicial to the fairness of the proceedings. See State v. Kociolek, 20 N.J. 92, 100 (1955).

In determining whether the deliberative process has been prejudicially tainted, it cannot be infested by racial or religious bigotry. As the Court discussed in State v. Loftin, 191 N.J. 172 (2007), "an impartial jury is one of the most basic guarantees of a fair trial." Id. at 187. In the context of a capital murder case, the Loftin Court considered the allegation that one of the jurors had expressed not only a pre-verdict opinion regarding defendant's guilt, but did so in a racially loaded fashion. Id. at 187-88. The defendant was African American and the juror white. Id. at 188. The juror was not part of the deliberating jury—however, because no voir dire of the panel was conducted, it was unknown whether he shared his "noxious sentiments[.]" Id. at 190. As the Court phrased it, the test is not whether his "presence on the jury 'actually

A-4524-15T2

influenced the result, but whether it had the capacity of doing so.'" Ibid. (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)). In other words, when improper notions enter the jury room, the possibility of taint suffices for a new trial.

Although uncertain from the record if greater efforts could have been made to locate good addresses for all four women jurors, the one juror who appeared did not clarify the "murky" facts. She remembered that the African-American juror spoke to the court aide, not the judge, about Husain's failure to place his hand on the Bible. However, and more disturbing, she revealed for the first time that the African-American juror made her comments to the other jurors during deliberations.

It may be that the African-American juror was troubled enough by the observation to have mentioned it both to the judge and the court aide, as well as the other jurors. Or it may mean that, eroded by the passage of time, the interviewed juror's memory is inaccurate—calling into question her statement that no one else was affected by the other juror's observation, even if it were reasonable for her to express the thinking of the other jurors. At this juncture, some eight years after the trial, it is not realistic to merely direct that the interview process continue.

As the Court said in Loftin,

A-4524-15T2

[t]o reconvene the [] jury at this time, however appealing it may seem, is not practicable. Even assuming that all the jurors are still alive and have not suffered an illness or condition that has affected their cognitive abilities, after the passage of so many years, we would have little faith that the juror interviews could produce reliable recollections . . . . The recollection of the most dutiful and honorable juror, however seemingly certain, will be fraught with the potential for error because of the possibility that in the intervening years even important words exchanged between jurors have been forgotten. We can demand only so much of human memory, with all its known frailties, in attempting to reconstruct long ago proceedings, and therefore caution must be our guide when the stakes are so high.

[191 N.J. at 199-200; see State v. Phillips, 322 N.J. Super. 429, 442 (App. Div. 1999).]

In Loftin, the Court simply granted defendant a new trial, in a scenario involving the greatest stakes possible. However, as with every other matter litigated in our courts, the outcome here is very important to those involved. The process must have been fair.

The juror's comment regarding the Bible raises the specter of religious bigotry. Whether that concern colored the view of the other jurors is still unknown, with the exception of the juror who appeared. This is a peculiar situation. The Law Division judge said the juror who made the observation was only concerned with Husain's credibility, i.e. that a person who refused to place

14

his hand on the Bible was incapable of taking the oath seriously and was therefore incredible. He contrasted this with out-and-out religious bigotry. But if he was correct, that too is simply impermissible. The exercise of a person's religion should not make him or her per se incredible.

In light of the passage of time, and to ensure no manifest injustice occurred, the only appropriate remedy is a new trial. There is no practical way to comply with the Supreme Court's directive of ascertaining whether a Rule 1:16-1 investigation is warranted. Only a new trial would ensure that the outcome was untainted. The possibility that the verdict was a miscarriage of justice is too great for us to decide otherwise.

Reversed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4524-15T2