**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0466-24

90 HACKENSACK AVENUE,
LLC,[1]

     Plaintiff,

v.

APONTE SERVICE STATION,
LLC and CARLOS APONTE,
Individually,

     Defendants,

_____

APONTE SERVICE STATION,
LLC,

     Third-Party Plaintiff/
Respondent,

v.

SCANDER, LLC and BASSEM
SCANDER, Individually,

---

[1] On October 11, 2021, a stipulation of dismissal with prejudice was entered as to all claims between plaintiff 90 Hackensack Avenue, LLC and defendants Aponte Service Station, LLC and Carlos Aponte, individually, and third-party defendants Aero Ambulance, Inc. and David Gato, individually.

Third-Party Defendants/
Appellants,

and

AERO AMBULANCE, INC.,
DAVID GATO, Individually,

Third-Party Defendants.

_____

Argued December 16, 2025 – Decided March 3, 2026

Before Judges Chase and Augostini.

On appeal from the Superior Court of New Jersey, Law
Division, Bergen County, Docket No. L-7638-20.

William M. Goldberg argued the cause for appellants,
Scander, LLC and Bassem Scander.

Alan I. Kraminsky argued the cause for respondent,
(Kraminsky Law, LLC, attorneys; Alan I. Kraminsky
and Justyna Eisenbardt, on the brief).

PER CURIAM

Following a three-day trial, the jury found third-party defendants Scander

LLC and Bassem Scander (Scander) (collectively defendants) liable for breach

of contract and the implied covenants of good faith and fair dealing and

fraudulent misrepresentation concerning the sale of a gas station. The jury

awarded compensatory and punitive damages. Defendants appeal from the

jury's unanimous verdict in favor of third-party plaintiff Carlos Aponte and the September 11, 2024 order of final judgment. We affirm.

I.

In 2015, Scander purchased a gas station located at 90 Hackensack Avenue in Hackensack. Scander, an absentee owner, operated the business until he sold it in September 2017.

The Ruby Point of Sale System (Ruby System) recorded all gas transactions occurring at the gas station. It then generated receipts documenting the financial information for the gas station, including: (a) the total number of gallons of gas sold by the gas station, both on a monthly and yearly basis; (b) the business's operating expenses for the year; and (c) the net profit of the business over the course of the year.

In 2017, Scander decided to sell the gas station, and retained Brian Elkin, a broker, to help him. Scander gave Elkin the gas station's Ruby System information, and Elkin used this information to prepare a fact sheet for prospective buyers. Scander's initial asking price was $285,000.

In May 2017, Aponte expressed interest in buying the gas station. On June 27, 2024, Aponte emailed an offer of $210,000 to Elkin, stating, "I am ready to make the purchase as soon as I can match the receipts with the supposed

3

revenues." However, before entering the Asset Purchase Agreement (Agreement), Aponte conducted his due diligence over approximately three months. As part of his due diligence, Aponte requested that Scander provide the invoices from the station's fuel suppliers.

Scander provided Aponte with a 2016 computer-generated spreadsheet summarizing the fuel sales. Scander, a software developer, decided to "automate the process" and created a software application to summarize the data regarding sales from the station's pumps. Scander explained that this application "aggregate[d] all the totals" of sales and invoices for "convenience" purposes "in addition to" the Ruby System's data. Even though Scander provided Aponte with these spreadsheets, he testified that the program he created was "absolutely not" reliable. Scander testified that on June 10, 2024, Aponte "took possession of all of the Ruby receipts for the years 2013 through . . . May of 2017, as well as the delivery slips for that same time period, [and the] inspection reports, monthly and annual, for that same time period."

During this due diligence period, Aponte "press[ed]" Scander for the current information about the station's business. On July 29, 2017, Scander provided Aponte with documents purporting to be invoices from P&J Fuel supplier for May and June 2017. One of P&J's owners, Jasbir S. Chandi,

4

A-0466-24

testified at trial, confirming that the invoices given to Aponte were not authentic P&J invoices. After Chandi testified, Scander admitted that the P&J invoices he provided were computer-generated and not the original invoices.

Aponte testified that these invoices induced him to buy the business because, after reviewing them, he "became excited about purchasing a successful business." Scander testified that he warned Aponte that the computer-generated P&J invoices were "unreliable" and that the program had "bugs." Contrary to Scander's assertion, Aponte testified that no such warnings were given verbally or in writing. Likewise, Elkin testified that no such warnings had been given during the meetings he attended with Aponte and Scander.

As the final step in his due diligence efforts, Aponte demanded to see the daily operations of the gas station for seven days. Scander refused to accommodate the seven-day request but agreed to have Aponte come to the station for two nights to see how "we close the station at night and verify the numbers at the end of the day." Ultimately, the parties agreed on three nights at that station so Aponte could "look at the receipts and the volume of diesel sold," because Aponte's main concern at this point was determining the amount of diesel sales.

A-0466-24

After his site visit, on August 20, 2017, Aponte sent an email to Scander stating he was glad "to see the current sales for the past few days" and "now knows its current state." Aponte further stated that he "would like to ignore last year[']s 2016 summary since it[']s too far off." Believing the business was still profitable, Aponte wanted to move forward with the purchase. However, based on his review, he reduced his offer to $205,000.

On August 25, 2017, Scander sent an email to Aponte's attorney stating that the computer-generated software would be included in the Agreement; however, in an "as-is-condition," and seller "assumes no responsibility for any software bugs contained within." Three days later, the parties signed the Agreement.

On September 15, 2017, the parties executed the final Agreement for a sale price of $225,000. The business later ultimately failed due to poor sales. In April 2021, Aponte sued Scander LLC and Scander, individually, alleging, in part, breach of contract and the covenant of good faith and fair dealing and fraudulent inducement.

On August 5, 2024, the jury trial began. On August 7, 2024, the jury returned a verdict of $225,000 in compensatory damages. The next day, the jury awarded Aponte $75,000 in punitive damages. Defendants filed a motion for a

A-0466-24

judgment notwithstanding the verdict (JNOV).  On August 30, 2024, after oral argument, the court denied the JNOV motion.  On September 11, 2024, an order of final judgment was entered in Aponte's favor totaling $332,400.86 which included the jury's award of $225,000 in compensatory damages, $75,000 in punitive damages and $32,400.84 in prejudgment interest through September 4, 2024.

Defendants argue on appeal that the jury verdict should be set aside because the jury disregarded key evidence, and that no reasonable jury could have concluded that Aponte relied on the fraudulent P&J invoices in tendering an offer to purchase the gas station.  Defendants further contend that the final judgment should be vacated because Aponte failed to prove a causal connection between defendants' conduct and any ascertainable loss.

## II.

"The jury is the preeminent factfinder in our system of justice, and the rendering of a jury verdict is entitled to the greatest deference."  State v. Lodzinski, 249 N.J. 116, 143 (2021) (citing Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011)).  Our Rules of Court provide for those instances where "[j]ury verdicts, like the decisions of judges and every decision involving human judgment, are susceptible to error."  Ibid.

A-0466-24

Under both a motion for JNOV pursuant to <u>Rule</u> 4:40-2 or a motion for a new trial pursuant to <u>Rule</u> 4:49-1, we apply the same standard that governs the trial courts.  <u>Conforti v. Cnty. of Ocean</u>, 255 N.J. 142, 162 (2023); <u>Risko</u>, 206 N.J. at 522.  Under <u>Rule</u> 4:40-2, we consider "whether the evidence presented at trial 'together with the legitimate inferences therefrom, could sustain a judgment in . . . favor of the party that prevailed at trial.'"  <u>Conforti</u>, 255 N.J. at 162 (quoting <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 N.J. 396, 415 (1997) (omission in original) (quoting <u>Dolson v. Anastasia</u>, 55 N.J. 2 (1969) (internal quotation marks omitted))).

Likewise, under <u>Rule</u> 4:49-1(a), the jury's verdict will only be disturbed if "it clearly and convincingly appears that there was a miscarriage of justice under the law."  <u>R.</u> 4:49-1(a).  A jury verdict should only be set aside if the outcome is "shocking to the conscience of the court."  <u>Risko</u>, 206 N.J. at 521 (quoting <u>Kulbacki v. Sobchinsky</u>, 38 N.J. 435, 456 (1962)).  A miscarriage of justice occurs where there is a "manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result."  <u>Ibid.</u> (alteration in original) (quoting <u>Lindenmuth v. Holden</u>, 296 N.J. Super.  42, 48 (App. Div. 1996) (quoting <u>Baxter v. Fairmont Food Co.</u>, 74 N.J. 588, 599 (1977))) (internal quotation marks omitted).

8

A.

Scander contends that no reasonable jury could have concluded that Aponte "reasonably relied" on the computer-generated P&J invoices because he knew the computer-generated information was "unreliable." Scander asserts the parties' emails between August 14 and August 20, 2017, demonstrate that Aponte did not rely on the computer-generated invoices because he knew that they were "too far off" compared to the Ruby system receipts. Furthermore, Aponte's three-day visit at the gas station to review the computer, gave him a picture of the "current state of the gas station," which informed his revised bid. Scander asserts this evidence contravened Aponte's trial testimony and speculates that the jury ignored this evidence. We are unpersuaded by these arguments.

Aponte testified that his main concern was the lack of information regarding the gas station's diesel sales. That testimony was corroborated by his August 14, 2017 email to Scander. According to Aponte, Scander stated that the diesel sales receipts were not on the Ruby System but rather only on the computer-generated documentation. Before visiting the gas station in August, Scander provided Aponte with the computer-generated invoices, which were invalid and unreliable.

 A-0466-24

Although Scander claimed he warned Aponte that the computer-generated information was unreliable, there was no corroboration of this claim either in writing or testimony. Indeed, Elkin, Scander's witness, refuted Scander's claim and testified that he was not present during a conversation where Scander allegedly warned Aponte about issues with the software application. Scander testified that he created the software application for his own convenience, particularly to automate the house accounts for tracking and payment purposes. However, he did not explain why the fuel invoices from P&J needed to be processed through the software application.

According to Scander's computer-generated spreadsheet and fact sheet, in 2016, the gas station sold 1,206,000 gallons and more than 100,000 gallons per month. Based on the documentation provided by Scander, Aponte concluded that in 2017 the total fuel sales were closer to 84,000 gallons per month, inclusive of the 32,000 gallons per month of diesel fuel sales. Therefore, relying on more current information, including the computer-generated diesel sales, Aponte revised his offer.

There was sufficient evidence to support the jury's verdict in Aponte's favor. The jury was free to make credibility determinations and by its verdict, appears to have credited Aponte's testimony, finding that he relied upon the

10

computer-generated P&J fuel invoices and was never told by Scander that those invoices were unreliable. As the trial court determined in denying Scander's JNOV motion, a reasonable jury "could reach the verdict they reached in this case." We agree that in these circumstances there was no "miscarriage of justice under the law" T.L. v. Goldberg, 238 N.J. 218, 230-31 (2019), and the jury's verdict did not involve a "manifest lack of inherently credible evidence to support [its] finding." Risko, 206 N.J. at 521 (citations omitted).

B.

Defendants next contend that we must vacate the jury's verdict as it relates to damages because the record is "barren" of any evidence of quantifiable loss, whether "measured by a reduction in sales volume, or loss of value sustained by the gas station." We disagree.

"An ascertainable loss is a loss that is 'quantifiable or measurable'; it is not 'hypothetical or illusory.'" Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 522 (2010) (quoting Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 248 (2005)). A plaintiff can prove an ascertainable loss by demonstrating either an out-of-pocket loss or a deprivation of the benefit of one's bargain. Ibid.

The jury was properly instructed on damages and "asked [to determine] what amount of damages would fairly and reasonably compensate [Aponte] as a

11

A-0466-24

result of [defendants'] actions or inactions." The jury awarded Aponte $225,000 in compensatory damages—the purchase price for the gas station. As the trial court correctly noted, "the proof of damages came from [Aponte's] testimony." Summarizing his testimony, the trial court found that Aponte paid $225,000 for the gas station, and "it wasn't worth anything, because what [Scander] gave [him] were fraudulent documents."

Scander also contends that Aponte's failure to produce expert testimony, bank records, tax filings, or other financial statements to support his damages' claim warrant vacatur of the damages award. As the trial court again correctly noted, no expert is required "when a plaintiff seeks to be made whole." Aponte did not make a claim for lost profits or damages resulting from Scander's fraud. His complaint sought reimbursement of the purchase price as "fair and reasonable" compensation. The jury was free to decide whether Aponte sustained an ascertainable loss after considering the evidence and testimony. We are satisfied the substantial, credible evidence supported the jury's damages award.

Defendants' remaining arguments are without merit sufficient to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

12

A-0466-24