7 A.3d 243 (2010)
416 N.J. Super. 585
Fernando J. GENSOLLEN, Plaintiff-Respondent,
v.
Albert L. PAREJA and Yajhara Costa, Defendants, and
Central Orthopedic Associates and Dr. Ronald Gerson, Appellants.
Docket No. A-0401-10T3.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 2010.
Decided November 19, 2010.
Joel B. Korin argued the cause for appellants (Ballard Spahr, attorneys; Mr. *244 Korin and Christopher N. Tomlin, Cherry Hill, on the brief).
Tara L. Cannaday argued the cause for respondent (Perskie Wallach Fendt & Holtz, attorneys; Ms. Cannaday, on the brief).
Before Judges CUFF, FISHER and SAPP-PETERSON.
The opinion of the court was delivered by
FISHER, J.A.D.
We granted leave to appeal in this matter to consider the extent to which a party may inquire into an expert's finances and litigation history in gathering information to prove at trial the expert's positional bias. Because defendants' expert, Dr. Ronald Gerson, already acknowledged at his deposition that more than ninety-five percent of his litigation work is for defendants, we find the trial judge abused his discretion in compelling Dr. Gerson to create and produce, at his own cost, documentation that would more precisely reveal the percentage of his work that is defendant-related, the frequency with which he has found plaintiffs to have sustained permanent injuries, and the amount of income derived from performing independent medical examinations (IMEs).
This problem was prompted when plaintiff served defendants with a notice to take the deposition of Dr. Gerson, defendants' medical expert, in this personal injury action.[1] The notice demanded that Dr. Gerson bring with him to the deposition the following:
1. Documentation indicating the percentage of [Central's] findings in the past five (5) years that supported the premise that plaintiff suffered no type of permanent injury.
2. Documentation indicating the percentage of [Central's] work that is defense related and the percentage of his work that is plaintiff related.
3. Documentation indicating what monies in the past five (5) years have been paid by defense attorneys to Central for conducting medical exams.
Dr. Gerson was represented at the deposition by his own counsel, who objected to the document request. Thereafter, without objection, Dr. Gerson testified that he conducted an average of eight to nine IMEs per week. He also testified that Central charges a fee of $895 per exam, but would impose additional charges depending on the extent of records and x-ray or MRI studies reviewed in a given case. In answering questions as to the income he personally receives from performing IMEs, Dr. Gerson responded that Central had twelve employees and other overhead expenses which have to be considered before any accurate estimate could be provided.
When questioned about the extent to which Central conducted IMEs for defendants as opposed to plaintiffs in litigation, Dr. Gerson responded:
The [IME] part of our practice ... is weighted well over 95 percent defense oriented. We made ourselves available for both, for plaintiff and defendant, but the vast majority of what we're asked to do is defense oriented, so that's what we do.
Not satisfied with the specificity of that response, plaintiff's counsel pressed on:

*245 Q. So when you say Central ... does over 95 percent, is it 97 percent, 98 percent?
A. I don't know the exact percentage, but the vast majority is defense oriented.
Q. So you don't know that percentage either, correct?
A. Well, it's well over 95 percent. I can't tell you the exact number, you know, but it's weighted well over 95 percent defense oriented.
Q. Doctor, I appreciate the over 95 percent, but there's still five percentage points and, believe it or not, it's a very important question for me. It may be for a jury. You have no way of telling me if it's 95, 96, 97, 98 or 99, correct?
A. No.
Still unsated, plaintiff's counsel moved in the trial court for an order compelling Dr. Gerson to provide the information sought in his document request; Dr. Gerson cross-moved for a protective order. By order entered on April 8, 2010, the judge granted plaintiff's motion and denied Dr. Gerson's without explanation.
Dr. Gerson moved for reconsideration, arguing among other things that the trial judge overlooked our unpublished opinion in another matter, in which we rejected a plaintiff's claim to similar discovery from Dr. Gerson. In seeking reconsideration, Dr. Gerson also submitted his own certification in which he attempted to quantify the burdensome nature of full compliance with plaintiff's document request. Specifically, Dr. Gerson claimed: he had "performed approximately 1600-1800 independent medical examinations" in the prior five years; Dr. Friedenthal had performed the same number and "possibly even more" in the prior five years; and to comply with the first paragraph of plaintiff's request he would "have to locate and review each and every IME report authored by Dr. Friedenthal or me over the last five years," and then "actually compile the results of my post hac analysis into a new document that otherwise would not exist."[2] He estimated "it would take ... approximately fifteen minutes per IME report, or a total of between 800 and 900 hours, to actually perform the analysis and compilation" called for by the first paragraph of plaintiff's document request. He also explained the similar difficulties he would encounter if compelled to comply with the other two paragraphs of plaintiff's document request.
Plaintiff's counsel responded with his own certification in which he argued that greater information to prove "positional bias" was necessary  despite Dr. Gerson's acknowledgement that he represented the interest of defendants in "well over" ninety-five percent of the cases in which he is asked to provide an IME  because counsel apparently believed the percentage was even greater. In one paragraph of his certification, plaintiff's counsel asserted that he has practiced law for more than twenty years, that his practice "is mostly comprised of plaintiff's work," that he has "cross[-]examined Dr. Gerson and Dr. Roy Friedenthal ... throughout my entire career," and that he was "unaware of any case in which [they] testified on behalf of a plaintiff in a personal injury suit ... [or] found a plaintiff to have suffered a permanent injury as the result of an automobile accident" (emphasis added). In another paragraph of the same certification, plaintiff's counsel stated in less absolute *246 terms that the IMEs conducted by Dr. Gerson "are almost exclusively for the benefit [of] defense attorneys" (emphasis added)  an assertion that seems indistinguishable from Dr. Gerson's own estimate.
For reasons expressed in a written opinion, the judge denied reconsideration. He rejected Dr. Gerson's argument that the unpublished opinion referred to in his motion warranted reconsideration because it was not precedential, citing Rule 1:36-3. He also cursorily dismissed Dr. Gerson's estimate of the time it would take to provide the information sought, concluding without other explanation that "clerical staff could easily distinguish between which files contain a permanency finding by looking at the common permanency language usually affixed to patient[s'] files." And the judge lastly concluded that because Dr. Gerson would not "affirmatively admit positional bias" he would be required to produce the information requested.
In reversing, we start with a premise that no one disputes  a litigant is entitled to explore in discovery whether an expert maintains a positional bias. However, contrary to what plaintiff argues and what the trial judge concluded, the pursuit of discovery from an expert is neither limitless nor may it continue unceasingly until the expert cries "uncle" and concedes positional bias. Instead, in the vast majority of cases, discovery should stop once the expert provides information that would permit the requesting party to argue to a factfinder that the expert is a "professional witness" or "hired gun" who mostly offers opinions that largely seek to vindicate a particular position.
We cannot, of course, provide a bright-line rule to be applied in all such matters. Each discovery request must inevitably turn on its own particular facts and circumstances. But, in ruling on similar discovery requests, trial judges must recognize that licensed professionals do not surrender their privacy rights when hired to render an expert opinion for monetary consideration. See, e.g., Berrie v. Berrie, 188 N.J.Super. 274, 282, 457 A.2d 76 (Ch.Div.1983) (holding that discovery from experts is hardly "unbridled" or "unlimited").
The discovery rights provided by our court rules are not instruments with which to annoy, harass or burden a litigant or a litigant's experts. R. 4:10-3; see also Hickman v. Taylor, 329 U.S. 495, 507-08, 67 S.Ct. 385, 392, 91 L.Ed. 451, 460 (1947) (recognizing that "limitations inevitably arise when it can be shown that [discovery inquiries are] being conducted in bad faith or in such a manner as to annoy, embarrass or oppress the person subject to the inquiry"). In this regard, we agree with the Supreme Court of Florida, which held in similar circumstances that:
an overly burdensome, expensive discovery process will cause many qualified experts, including those who testify only on an occasional basis, to refrain from participating in the process, particularly if they have the perception that the process could invade their personal privacy. [Excessive discovery into an expert's finances or into other extraneous matters] could have a chilling effect on the ability to obtain doctors willing to testify and could cause future trials to consist of many days of questioning on the collateral issue of expert bias rather than on the true issues of liability and damages.
[Elkins v. Syken, 672 So.2d 517, 522 (Fla.1996).]
In providing general parameters for the scope of discovery in such matters, we initially observe that, of course, a party is entitled to inquire into the particular financial arrangements between an adverse *247 party and that party's expert. See R. 4:17-4(e) (declaring that in responding to expert interrogatories, a party must provide "whether compensation has been or is to be paid for the report and testimony and, if so, the terms of the compensation"). A party may also ask for an estimate of the extent to which the expert has rendered opinions for plaintiffs or defendants. And a party may obtain an approximation of the portion of professional time the expert devotes to providing services in litigation. In the vast majority of cases, truthful responses to those inquiries will likely provide all the information necessary for the party to argue that the expert possesses a positional bias and will be sufficient to terminate any further inquiry into the expert's private business and financial matters.
The matter at hand fits this paradigm. At his deposition, Dr. Gerson identified the costs he charged for rendering an IME, estimated the amount of time he spends in providing litigation services as opposed to other professional pursuits, and pinpointed the extent to which he provides litigation services for defendants at "well over 95 percent." These responses provided plaintiff with all the information necessary to argue to the jury that Dr. Gerson is a "hired gun" and his opinions should therefore not be trusted. As a result, there was no need to compel the production of further information from Dr. Gerson, let alone impose on him the burdensome obligation to cull additional information from five years worth of records or to compel him to create documents, which do not presently exist, that might incrementally move the estimate of "well over 95 percent" a percentage point or two on the continuum.
It is also important to recognize what we need not and have not decided. We have not been presented with a case in which the requesting party contends, with sufficient supporting proof, that the expert has failed to provide accurate estimates. In the motions following Dr. Gerson's deposition, plaintiff's counsel filed a lengthy certification in which he claimed the litigation services provided by Dr. Gerson "are almost exclusively for the benefit [of] defense attorneys" (emphasis added), a statement we view as entirely consistent with Dr. Gerson's own estimate. Because plaintiff failed to sufficiently challenge the accuracy of Dr. Gerson's estimates, no cause was presented to permit the additional feeding of plaintiff's insatiable demand for mathematical exactitude.
In short, plaintiff failed to sustain the burden of obtaining additional discovery, let alone the extraordinarily broad discovery required by the trial judge. Indeed, the order compelling discovery in this case could serve no purpose except to harass and burden defendant's expert.[3] We *248 conclude, as held by the court in Elkins, that "the expert's business records, files, and 1099's" should only be produced "upon the most unusual or compelling circumstance[s]," id. at 521, which were certainly not presented here. And we can think of no circumstance in which an expert should be ordered "to compile or produce nonexistent documents." Ibid. Accordingly, we conclude that the trial judge abused his discretion in entering the orders under review.
Reversed.
NOTES
[1] Dr. Gerson and Dr. Roy Friedenthal are the principals of Central Orthopedics. The document request actually sought information regarding Central's work and income but this distinction is not relevant to our disposition of this appeal.
[2] Dr. Gerson also explained that he, instead of clerical staff, would have to personally perform the task "because this analysis ... would require a medical doctor to review the contents of each IME report to determine whether the examinee in question can be characterized as having a `permanent injury.'"
[3] Even if we were to assume  for hypothetical purposes  that Dr. Gerson had claimed he did not provide such a high degree of litigation services to defendants, we still would find plaintiff's motion to be inadequate to compel additional discovery. Plaintiff's counsel solely presented his own experiences with Dr. Gerson, asserting only that, in his approximate twenty years of practice, he was "unaware of any case in which Drs. Gerson or Friedenthal testified on behalf of a plaintiff in a personal injury suit." Counsel did not quantify the number of cases his own experience might have encompassed, let alone any other reliable evidence, to justify the leap that Dr. Gerson never opines favorably for plaintiffs. In other words, plaintiff's counsel asked the trial judge to conclude that because counsel was "unaware" of any such case that there never could have been such a case. Putting aside that it is quite possible Dr. Gerson's estimate and plaintiff's counsel's conclusion may both be true  that Dr. Gerson has opined in favor of plaintiffs and counsel here is simply "unaware" of it  it is not clear to us why the estimate provided by plaintiff's counsel was afforded greater weight than Dr. Gerson's own estimates. Absent a more concrete presentation, an attorney's nonspecific, anecdotal contentions cannot provide an adequate basis for intervention into an expert's private information beyond what we have already described as permissible in the ordinary case.