**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1116-17T2

WASHINGTON MUNOZ,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

NEW JERSEY SPORTS & EXPOSITION
AUTHORITY, NEW MEADOWLANDS
RACETRACK, LLC, KF MECHANICAL,
LLC, COUNTRY SIDE PLUMBING
& HTG, COUNTRYSIDE PLUMBING
AND HTG, COUNTRY SIDE
PLUMBING, COUNTRY SIDE
PLUMBING & HEATING, INC.,

      Defendants,

and

LP CIMINELLI, INC., LP CIMINELLI
RCCIP, COOPER PLASTERING
CORPORATION, PAINO ROOFING
COMPANY, INC., and PAINO
ROOFING CO., INC.,

      Defendants-Appellants/
      Cross-Respondents.

_____

Argued March 27, 2019 – Decided April 23, 2019

Before Judges Alvarez, Nugent and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3284-15.

Timothy E. Burke argued the cause for appellants/cross-respondents (Mc Elroy Deutsch Mulvaney & Carpenter, LLP, attorneys; Richard E. Brennan and Samuel A. James, on the briefs).

Gerald H. Clark argued the cause for respondent/cross-appellant (Clark Law Firm, PC, attorneys; Gerald H. Clark, Lazaro Berenguer, and Mark W. Morris, of counsel and on the briefs).

PER CURIAM

Defendants LP Ciminelli (Ciminelli) and Paino Roofing Co., Inc. (Paino), appeal from a November 9, 2017 judgment memorializing a jury verdict in favor of plaintiff Washington Munoz in this personal injury matter. Plaintiff cross-appeals from the trial court's dismissal of his future lost wages and punitive damages claim. We affirm.

We take the following facts from the record. Plaintiff, a union employee of Cooper Plastering Corp. (Cooper), was installing plaster on the roof of the Meadowlands Racetrack. Cooper was a masonry subcontractor hired by the construction manager, Ciminelli. The roof surface was flat and covered by a thin, flexible, rubber membrane, which had been installed by Paino, the roofing

subcontractor. The membrane covered at least two six-inch recessed roof drain holes, causing a slight indentation at the site of each drain and obscuring them from view. The construction plans required the membrane to be cut and fitted around the drains on the roof, but this was not done at the time of the incident.

Plaintiff walked across the roof carrying two sixty-pound buckets of plaster, and a work bag filled with tools slung over his shoulder. Plaintiff, who had not previously been on the roof, looked down, not ahead, as he walked. He testified the roof "looked straight," but he did not otherwise inspect the roof area before he walked across it. As plaintiff stepped onto one of the covered drain holes, the membrane gave way and caused him to lose his balance and twist in position, thereby causing his tool bag to slip down his arm, pulling his shoulder. Plaintiff felt his body contort and immediately felt pain in his arm and back. A co-worker, who was on the roof with plaintiff, testified there were no signs indicating the presence of the hole and that plaintiff injured his back.

Ciminelli's worksite policy required workers to report injuries the same day of their occurrence. Plaintiff did not immediately report the incident because no one from Ciminelli was present to take his report. Plaintiff attempted to continue working, but could not because of the pain.

A-1116-17T2

The following day, plaintiff notified Ciminelli's project safety supervisor about the incident. When the safety supervisor observed the membrane-covered drain hole, he responded "fucking roofer." The safety supervisor directed plaintiff to leave the site and stated he could no longer work there because he failed to timely report the injury.

Plaintiff's treating orthopedic surgeon testified plaintiff had sustained a serious injury to his back and shoulder as a result of this incident. Specifically, plaintiff had a torn rotator cuff, a ruptured disc, a displaced biceps tendon, subacromial-impingement, bursitis, and disc bulges and disc protrusion. Although plaintiff underwent two surgical procedures, his doctor testified the rotator cuff tear had worsened and required another surgery. Plaintiff's doctor classified his injuries as "permanent" and noted he remained in treatment for ongoing pain. He also testified plaintiff would have a "Popeye sign" or "very obvious" deformity on his arm.

The defense provided the video testimony of its medical expert who testified plaintiff "had torn [the] right biceps tendon" as a result of the accident. However, he claimed the rotator cuff tear occurred after the surgery and was unrelated to the accident.

In addition to testimony concerning his physical injuries, plaintiff presented the video testimony of a psychologist who testified he had suffered mentally because of his inability to work, provide for his family, and enjoy athletics and recreation.[1] The psychologist diagnosed plaintiff with major depressive disorder caused by the injury. She recommended psychotherapy and possible treatment with antidepressants, and testified that without such treatment "the quality . . . of his day-to-day and his psychological well-being will be affected and probably spiral in a negative way[.]"

Plaintiff presented evidence he incurred $104,671.14 in past medical bills. His doctor estimated plaintiff would incur $25,000 in future orthopedic treatment costs. His psychologist estimated that, given plaintiff's life expectancy, he would incur $170,000 in psychotherapy expenses and, if required, $221,000 in psychopharmacological treatment, depending on the medication cost, frequency of use, dosage, and brand.

Plaintiff testified he was unable to work in construction after the accident, had limited earnings of approximately $4000 for unspecified construction work,

---

[1] Plaintiff's family members corroborated the psychologist's testimony. Plaintiff's former wife and daughter testified and explained he was very active, hardworking, and happy, but was not the same since the accident and could no longer play sports, as he had before the accident.

and also worked as an emcee at parties. Plaintiff had a prior career as a truck driver. He testified that because of a previous car accident, he was "traumatized behind the wheel [and could not drive] a truck because [he] get[s] nervous." Plaintiff did not offer testimony as to other future employment plans. However, his doctor testified his injury would prevent him from performing "any heavy work[.]"

Plaintiff earned thirty-nine dollars per hour working for Cooper on a full-time basis, with occasional overtime. He presented a pay stub, which showed gross earnings of $1606.80 and $1150.68 in net pay per week.

Plaintiff presented testimony from a workplace safety expert who concluded Ciminelli and Paino had a non-delegable duty to maintain the work site in safe condition, which included the duty to perform safety inspections, correct hazards, and otherwise assure job site conditions were in compliance with Occupational Safety and Health Administration (OSHA) standards. The expert cited Ciminelli's safety manual, which stated "[c]ontractors are ultimately responsible for the safety of their own employees and any of their subcontractors on the jobsite" and the contract between Ciminelli and Paino, which held Paino responsible for the safety of its employees.

Plaintiff's expert referred to OSHA safety standards and testified holes should be covered with material capable of holding twice the expected weight and marked to indicate it is covering a hole. The expert noted the rubber membrane which covered the drain holes could not bear plaintiff's weight, which is what caused him to lose his balance and sustain injuries. Plaintiff's expert characterized the drain as a "boob[y] trap" because the hole was not visible. He concluded Ciminelli had not complied with the required OSHA standards because the hole was improperly covered.

Plaintiff's expert concluded both Ciminelli and Paino were responsible for the conditions which led to plaintiff's injury based on the duties imposed on them by Ciminelli's safety manual. Importantly, the expert concluded plaintiff had not violated any safety instructions by walking across the roof while looking down because even if plaintiff had looked ahead, or inspected the roof prior to carrying the plaster buckets, he would not have seen the membrane-covered drain hole, or understood it was a hazard.

The jury found that Ciminelli and Paino were negligent and their negligence was a proximate cause of the incident. They also found that plaintiff was negligent but his negligence was not a proximate cause of the incident. The jury apportioned seventy percent liability to Ciminelli and thirty percent to

A-1116-17T2

Paino. The jury awarded plaintiff $2.4 million for pain, suffering, impairment, disability, and loss of enjoyment of life; $104,671 in past medical bills; $150,000 for future medical expenses; and $235,248 for his past lost earnings. Plaintiff's past medical bills were conformed to $35,318.19, pursuant to N.J.S.A. 2A:15-97, for a total verdict of $2,820,566.19.

The trial judge dismissed plaintiff's punitive damages claim, denied defendants' motion for a new trial or remittitur, and entered judgment in favor of plaintiff. This appeal and cross-appeal followed.

I.

A trial judge must grant a motion for a new trial if "it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). We apply the same standard on appeal. R. 2:10-1. A miscarriage of justice exists when a "pervading sense of 'wrongness'" justifies the "undoing of a jury verdict[.]" Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 599 (1977)).

Generally, a motion for a new trial is within the sound discretion of the trial court. Ibid. In reviewing the trial court's ruling, the appellate tribunal must still "defer to the trial court in those areas where the trial court has expertise, or a 'feel of the case,' e.g., the credibility or demeanor of the witnesses." Id. at 49

(quoting Thomas v. Toys "R" Us, Inc., 282 N.J. Super. 569, 579 (App. Div. 1995)).

"When a court is persuaded that a new trial must be granted based solely on the excessiveness of the jury's damages award, it has the power to enter a remittitur reducing the award to the highest amount that could be sustained by the evidence." Cuevas v. Wentworth Grp., 226 N.J. 480, 499 (2016). Courts "must exercise the power of remittitur with great restraint." Ibid. "A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness[,]'" which "is not overcome unless a defendant can establish, 'clearly and convincingly,' that the award is 'a miscarriage of justice.'" Id. at 501 (quoting Baxter, 74 N.J. at 596, 598). "[E]ven a seemingly high award should not be disturbed; only if the award is one no rational jury could have returned, one so grossly excessive, so wide of the mark and pervaded by a sense of wrongness that it shocks the judicial conscience, should a court grant a remittitur." Id. at 500.

"[W]hen considering a remittitur motion, a court must view 'the evidence in the light most favorable to the plaintiff.'" Id. at 501 (quoting Johnson v. Scaccetti, 192 N.J. 256, 281 (2007)). "[T]he court must give 'due regard to the opportunity of the jury to pass upon the credibility of the witnesses.'" Ibid.

9

(quoting He v. Miller, 207 N.J. 230, 248 (2011)). "The standard for reviewing a damages award that is claimed to be excessive is the same for trial and appellate courts, with one exception—an appellate court must pay some deference to a trial judge's 'feel of the case.'" Ibid. (quoting Johnson, 192 N.J. at 282).

Defendants argue the trial judge erred in denying their motion for a new trial because: 1) the jury could not find plaintiff negligent and also find his negligence was not the proximate cause of his injuries; 2) the amount of damages was excessive and unsupported by the evidence;[2] 3) the judge erred in admitting evidence regarding the defense medical expert's earnings and business; 4) the jury's award of future medical expenses and past lost wages was unsupported by the record; 5) the summation by plaintiff's counsel was improper and prejudicial; and 6) the aforementioned errors cumulatively led to a prejudicial outcome.

On his cross-appeal, plaintiff claims his past lost earnings could prove his future lost wages, there was evidence to support the award of punitive damages, and the trial judge erred when she dismissed these claims. We address the arguments raised in turn.

---

[2] In the alternative, defendants argue for remittitur on this issue.

A-1116-17T2

## A.

Defendants claim the jury could not find defendants and plaintiff were both negligent, and also conclude plaintiff's negligence was not the proximate cause of his injuries. Defendants assert the judge erred when she denied them a new trial because plaintiff's and defendants' negligence could not be "unbundled." We disagree.

Negligence and proximate cause are separate and distinct elements, and are typically separate questions. Lancos v. Silverman, 400 N.J. Super. 258, 272 (App. Div. 2008). Determining proximate cause requires a "combination of 'logic, common sense, justice, policy and precedent' that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." People Express Airlines, Inc. v. Consol. Rail Corp., 100 N.J. 246, 264 (1985) (quoting Caputzal v. Lindsay Co., 48 N.J. 69, 77-78 (1966)).

Mere negligence does not necessarily equate with proximate cause. Rather, the negligent act must be a "substantial factor" in bringing about the injury. Perez v. Wyeth Labs. Inc., 161 N.J. 1, 26 (1999); James v. Arms Tech., Inc., 359 N.J. Super. 291, 311 (App. Div. 2003). "A jury may consider a plaintiff's negligence only when the evidence adduced at trial suggests that the plaintiff was somehow negligent and that negligence contributed to the

plaintiff's damages." Fernandes v. DAR Dev. Corp., 222 N.J. 390, 408 (2015) (citing Roman ex. rel. Roman v. Mitchell, 82 N.J. 336, 343 (1980)).

The trial judge found the purported basis for a new trial was "grounded in a disagreement as to how the jury interpreted the evidence and to how the jury may have viewed the credibility of certain witnesses[.]" The judge did not address defendants' arguments as to the jury's finding regarding plaintiff's own negligence.

In this regard, we note plaintiff, who was encumbered by heavy buckets and a tool bag, stepped into a hole covered by an opaque rubber liner. His testimony established that the roof ahead of him looked "flat" and "straight." Under these circumstances, the jury could reasonably find plaintiff's failure to pay attention and look down while he was walking was not a substantial factor in causing the accident because the obscured hole was not readily visible, and plaintiff would not have seen it even if he had paid attention. Even if plaintiff had noticed the slight indentation in the roof surface, there is no evidence he would have reason to believe this indentation would give way. Thus, the facts demonstrated a reasonably prudent person acting without negligence would have stepped into the hole. The facts do not prove—directly or circumstantially—

plaintiff's negligence was the proximate cause of his own injuries. The trial judge's decision to deny defendants a new trial was sound.

B.

Defendants challenge the trial judge's decision denying a new trial, or alternatively remittitur, regarding the damages awarded by the jury. They argue the sum of the award "was excessive in light of plaintiff's complaints" and allege plaintiff suffered no life-altering injuries, broken bones, loss of bodily function, or any extended hospitalization, and has continued to perform the activities of daily living. Defendants emphasize the testimony did not demonstrate plaintiff was unable to work.

Remittitur is appropriate where a jury award is excessively "glaring" and "obvious." Cuevas, 226 N.J. at 509. The Cuevas Court further noted, the calculation of emotional distress damages is not a scientific process and is by definition "inexact." Id. at 500. Because no two juries will award the same damages, "a permissible award may fall within a wide spectrum of acceptable outcomes." Ibid. In this regard, the Court stated: "[i]n the end, a thorough analysis of the case itself; of the witnesses' testimony; of the nature, extent, and duration of the plaintiff's injuries; and of the impact of those injuries on the

plaintiff's life will yield the best record on which to decide a remittitur motion."

Id. at 510.

Here, following Cuevas, the trial judge stated:

> [W]hat I cannot do is to substitute what this [c]ourt's judgment would be in terms of an appropriate jury's verdict but, rather, must look at that evidence and determine whether or not reasonable minds could, in fact, rule as it did and so, with that as the standard, I am not persuaded that the jury's verdict is so excessive, so shocking to the conscience that it should be set aside. So, for those reasons, the motion for a new trial [and] the motion for remittitur must be denied.

We agree. The jury's award may have been substantial, but it does not shock the conscience or represent a miscarriage of justice under the facts presented. The evidence in the record showed plaintiff experienced significant detrimental changes in many facets of his life. He could not engage in leisure, social, or work activities as he had done before the accident. The expert testimony corroborated these facts, demonstrating plaintiff suffered from psychological ailments, permanent physical injury, and disfigurement as a result of the accident, and required significant future treatment. For these reasons, the trial judge's decision declining to disturb the jury award was not an error.

C.

Defendants challenge the trial judge's admission of evidence regarding their medical expert's earnings, the sale of his business for a substantial sum of money, and his work for defense firms.  We find no reversible error.

We review the trial court's decisions to admit or exclude evidence under an abuse of discretion standard.  Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010) (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).  We "grant[] substantial deference to the evidentiary rulings of a trial judge."  Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 319 (2006) (citing DeVito v. Sheeran, 165 N.J. 167, 198 (2000)).  Accordingly, absent a showing the trial court abused its discretion, we will not reverse a decision concerning the admission or exclusion of evidence unless we conclude it was so wide of the mark as to bring about a manifest injustice.  E & H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 24-25 (App. Div. 2018) (citing Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016)).

Here, pursuant to the testimony of defendants' medical expert, the jury learned he previously owned a company, which performed medical evaluations for litigation purposes, and sold the business for a substantial sum to another company, for whom he continued to perform evaluations.  The expert also

A-1116-17T2

testified he performed ninety-eight percent of his evaluations on behalf of defense firms and marketed to them.

At the outset of the trial, the judge determined the source of the expert's earnings from defense work was relevant because it "speaks to the bias that he may or may not have," and the weight it would give his testimony. Following the trial, the judge reviewed the expert's testimony and concluded it was not grounds for a new trial because the information would not "have prejudiced the jury to the point where a manifest injustice has resulted." We agree.

Part of the jury's task in evaluating an expert's credibility requires it to consider "the interest of any witness in the outcome of the lawsuit." Jurman v.Samuel Braen, Inc., 47 N.J. 586, 593 (1966). An expert's fee, and his or her work history as an expert witness, are admissible evidence. See Espinal v. Arias, 391 N.J. Super. 49, 60-61 (App. Div. 2007) (admitting testimony as to the amount of the expert's fee, and his frequent appearances as an expert before the court).

In Gensollen v. Pareja, 416 N.J. Super. 585, 591 (App. Div. 2010), we discouraged "excessive" and "burdensome" discovery on an expert's finances, but did not limit the scope of an expert's testimony on these points. Ibid. (quoting Elkins v. Syken, 672 So. 2d 517, 522 (Fla. 1996)). We held a "party

16

may obtain an approximation of the portion of professional time the expert devotes to providing services in litigation." Ibid. Indeed, "[w]hether an expert is a 'hired gun' or one whose opinions have greater foundations of objectivity is an issue to be litigated by counsel and considered by the jury." Cogdell v. Brown, 220 N.J. Super. 330, 336 (Law Div. 1987).

Here, the expert had a significant work history on behalf of defense firms and derived nearly all of his income from such clientele. Moreover, the expert had turned his forensic consulting business into a defense-oriented product by marketing and ultimately selling his company to a defense expert evaluation provider. This information was probative on the issues of credibility and bias, as it allowed the jury to consider the nature, scope, and scale of his work, and whether the expert was pre-ordained to an outcome. For these reasons, the judge's determination to admit this evidence was not an abuse of discretion.

## D.

We next address defendants' challenges to the award of future medical expenses and past lost wages to plaintiff. Defendants argue both awards are unsupported by the evidence and were grounds for a new trial.

The jury may award future medical expenses where there is a reasonable probability such expenses "flow[ed] from the past harm[.]" Coll v. Sherry, 29

N.J. 166, 175 (1959); <u>Dombroski v. City of Atlantic City</u>, 308 N.J. Super. 459, 469 (App. Div. 1998); <u>Higgins v. Owens-Corning Fiberglas Corp.</u>, 282 N.J. Super. 600, 611-12 (App. Div. 1995). Future medical expenses are permissible where they "can be calculated objectively and without difficulty" and "discounting the future loss to present value is not only just, but feasible." <u>Mauro v. Owens-Corning Fiberglas Corp.</u>, 225 N.J. Super. 196, 211 (App. Div. 1988).

Here, as noted, there was ample medical testimony from plaintiff's medical experts to demonstrate the accident harmed plaintiff and that he would require treatment into the future. Moreover, the experts quantified the costs of the future treatments.

The jury awarded plaintiff $150,000 in future medical expenses. Considering the credible expert testimony in the record regarding future medical expenses, and that the jury awarded only a portion of the sum sought by plaintiff, we conclude the award was supported by credible evidence and was neither speculative nor grounds for a new trial.

We reach a similar conclusion regarding the jury's decision to award plaintiff past wages. A plaintiff need not prove damages with "exactitude," but rather "with such certainty as the nature of the case may permit, laying a

foundation which will enable the trier of the facts to make a fair and reasonable estimate." Caldwell v. Haynes, 136 N.J. 422, 436 (1994) (quoting Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987)).

Notably, our law does not require documentary evidence of lost wages and, instead, testimony is sufficient for the jury to consider such claims. See Ruff v. Weintraub, 105 N.J. 233, 236 (1987) (plaintiff's testimony was sufficient to prove her net income); Langley v. Allstate Ins. Co., 206 N.J. Super. 365, 368-71 (App. Div. 1985) (a wage claim was permitted in a wrongful death matter despite a lack of paper records).

Here, plaintiff testified he earned thirty-nine dollars per hour. He submitted a pay stub, which showed $1606.80 in gross weekly wages, and $1150.68 in net weekly wages. The trial judge charged the jury, without objection, in accord with Model Jury Charges (Civil), 8.11C, "Loss of Earnings" (rev. July 2010) as follows:

> The plaintiff also has a right to be compensated for any earnings lost as a result of injuries caused by the defendant's negligence. Any award for lost earnings must be based upon net take home pay not on gross income.
>
> This is because only take-home pay, the amount that's left taking out taxes would have been received by the plaintiff and the amount you award is not subject to federal or New Jersey income taxes.

So you must first decide whether [plaintiff] proved that he was disabled by his injuries which in turn resulted in lost income. If so you must then decide and fix the amount of lost earning.

Do this by considering the length of time . . . the plaintiff was not able to work, what his income was before the injuries, how much he earned upon return to work, whether the injuries affect his ability to do tasks required on the job and any lessening or decrease in the income if he returned to work. In your analysis, think about special skills the plaintiff has and whether there were any other jobs available that he was able to do to earn income. The plaintiff must have tried to minimize the earnings lost, but extraordinary or impractical efforts are not necessary.

The jury awarded plaintiff $235,248 in past lost wages. Based upon the objective evidence presented of plaintiff's net income, this sum approximated plaintiff's net earnings from the date of his injury to the trial. The past lost wage award was supported by credible evidence in the record and does not constitute reversible error.

E.

Defendants argue the summation by plaintiff's counsel prejudiced the jury. They assert the summation created a plain error and requires a new trial.

Rule 2:10-2 states:

Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but

20

> the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.

As a general proposition, the failure to object to a point raised in summation indicates that counsel did not believe the remarks were prejudicial. The omission also deprives the trial court of the opportunity to take curative action. Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009).

Attorneys are allowed "broad latitude in closing arguments." Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 128 (2008) (citing Bender v. Adelson, 187 N.J. 411, 431 (2006)). But, "[s]ummations must be 'fair and courteous, grounded in the evidence, and free from any "potential to cause injustice."'" Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011) (quoting Jackowitz, 408 N.J. Super. at 505 (quoting Geler v. Akawie, 358 N.J. Super. 437, 463 (App. Div. 2003))). Summations are improper "[w]here they cross the line beyond fair advocacy and comment, and have the ability or 'capacity' to improperly influence the jury's 'ultimate decision making[.]'" Ibid. (quoting Bender, 187 N.J. at 416). Furthermore, "it is improper for an attorney to make derisive statements about parties, their counsel, or their witnesses." Szczecina v. PV Holding Corp., 414 N.J. Super. 173, 178 (App. Div. 2010). In Jackowitz, 408

N.J. Super. at 499, we held an attorney may not urge the jury to "send a message" when determining the amount of compensatory damages.

Here, defendants point to four segments of plaintiff's summation as objectionable. They are as follows:

First,

> And that's why it's important for these basic safety rules to be followed. So we go into it, into the injuries and the damage because the next thing you're going to be asked after you get down to the parties in the case is about making up for the harms and losses and an analogy like, you know, when we were kids, maybe if you played stickball or something, you know, and you shot to the next yard or something and you broke a window, you know, your parents might have marched you right over there and made you, you know, admit you did something wrong, apologize for it, and then say, I'm going to make up for it. I'm going to pay for the window.

> And that's the part of the case of my closing we're now in. We don't have any of that here. Obviously, we have no admission. We don't have any remorse and you saw that when you heard from [Ciminelli's safety manager] and some of the others, and they don't want to pay for it, so that's why you guys are here because we're asking you to make up for the harms and losses that happened here.

Second,

> And as we talked about, defendants accept no responsibility, which is why you're here, and we have [p]laintiff's [e]xhibit [twenty], which is in evidence in

22

the case and not only do they not accept the responsibility here, but it's actually in their . . . booklet, if we can go to that page.

Third,

So what's this case really about?  Let's go to the next slide where you talk about damages and injuries and we start . . . right back at . . . Ciminelli's safety manual again.  It's your finger, your eye, and your life that we are concerned about.  They are irreplaceable.  Your means of livelihood is diminished, at worst destroyed when you are disabled.  You and your family are the people to suffer the most.  Safety rules help protect you.

Fourth,

[Co-counsel] asked me to put this in here.  It says, the book of [P]roverbs says, speak up for those who cannot speak for themselves for the rights of all who are destitute.  Speak up and judge fairly, defend the rights of the needy, and I think that's appropriate when we talk about balancing the scales of justice in this case.

At the outset we note, defendants did not object during summation.

Notwithstanding, we do not find the summation constitutes plain error.  Indeed,

counsel's comments regarding defendants' lack of remorse derived from a

statement by the Ciminelli's safety manager.  Moreover, the statement and

counsel's comment that it demonstrated a failure to accept responsibility were

within the context of counsel's discussion of the Ciminelli safety manual.  The

manual stated: "Each member of the [Ciminelli] corporate management team is

23

accountable for the safety, well-being, and safe work conduct of individuals at our sites." (Emphasis added). The manual further stated "Contractors are ultimately responsible for the safety of their own employees and any of their subcontractors on the jobsite. This does not relieve the prime/subcontractor from their responsibility to their own employees[.]" Therefore, it was not reversible error for plaintiff's counsel to cite the comment of Ciminelli's safety manager or note defendants had avoided the accountability and responsibility their own safety manual imposed upon them.

Defendants also misconstrue the portion of plaintiff's summation, which we have delineated in segment four. Here as well plaintiff's comments derived from Ciminelli's safety manual whose summary read as follows: "It is your finger, your eye, and your life that we are concerned about. They are irreplaceable. Your means of livelihood is diminished, or at worst destroyed, when you are disabled. You and your family are the people to suffer the most. Safety rules help protect you."

Thus, read in context, counsel's comments were not clearly capable of producing an unjust result. The summation did not constitute reversible error.

## F.

Finally, because there was no individual error requiring reversal, there was no cumulative error. On the cross-appeal, we affirm substantially for the reasons expressed by the trial court.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1116-17T2