**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1612-19

MITCHELL & ASSOCIATES, INC.,

     Plaintiff-Appellant/Cross-
     Respondent,

v.

PCB APPS, LLC and NOLA
BUSINESS SOLUTIONS, INC.,

     Defendants/Third-Party
     Plaintiffs-Respondents/Cross-
     Appellants,

and

NAG KARAKA,

     Defendant/Third-Party Plaintiff,

v.

DWIGHT MITCHELL,

     Third-Party Defendant.

_____

Submitted April 19, 2021 – Decided May 21, 2021

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5751-16.

Rubin, Kaplan & Associates, attorneys for appellant/cross-respondent Mitchell & Associates, Inc. (Evelyn A. Donegan, of counsel and on the briefs).

Archer & Greiner, PC, attorneys for respondent/cross-appellant PCB Apps, LLC (Michael J. Lauricella, of counsel and on the briefs).

PER CURIAM

Plaintiff Mitchell & Associates, Inc. appeals from the following orders: pretrial discovery orders;[1] evidentiary and in limine determinations rendered by the trial judge on September 3, 2019; a September 9, 2019 order barring plaintiff's representative from presenting certain testimony during trial; an October 25, 2019 order denying plaintiff's motion for additur or, alternatively, a new trial on damages only; and a November 13, 2019 order for judgment awarding damages to plaintiff in the amount of $177,000. Defendant PCB Apps, LLC (PCB) cross-appeals from the following: denial of its motion in limine to preclude testimony by plaintiff's representative regarding PCB's financial

---

[1] Plaintiff's notice of appeal includes four pretrial discovery orders: a November 21, 2019 order, two January 25, 2019 orders, and a March 26, 2019 order. Only one discovery order, a January 25, 2019 order, was included in plaintiff's appendix.

figures; an order denying PCB's motion for a directed verdict; and an October 25, 2019 order denying PCB's <u>Rule</u> 4:40 motion. We affirm all orders on appeal and cross-appeal.

We begin with a brief summary of the parties' dispute. Three individuals, Dwight Mitchell, Bryan Boutte, and Nag Karaka sought to form a joint venture. Their effort to form a joint venture never materialized in a formal written agreement, although the three men participated in multiple email exchanges and face-to-face meetings regarding the joint venture. Mitchell eventually demanded payment for plaintiff's work performed pursuant to the joint venture. Boutte, Karaka, and their separate companies declined to pay plaintiff.

The following is a more detailed recitation of the facts giving rise to the appeal and cross-appeal based on the testimony adduced by the witnesses during the trial.

<u>Testimony of Dwight Mitchell</u>

Plaintiff's principal, Mitchell, testified his company implemented large scale computer systems for multi-national corporations. Specifically, plaintiff sells and services software to clients. On occasion, plaintiff employed subcontractors to perform its work. In 2014, plaintiff worked on a project for AT&T and AT&T's client, Berry Plastics, Inc. (Berry). Realizing it needed

assistance with the AT&T and Berry job, plaintiff hired subcontractors through PCB.[2]

Through the AT&T and Berry work, Mitchell met Boutte.[3] Boutte wanted to work with Mitchell and potentially form a partnership. Mitchell initially declined the offer to form a partnership. Boutte then offered to invest $100,000 as a "capital investment" in a potential partnership, and Mitchell agreed to work with Boutte and Nola. The partnership intended to sell services to AT&T's clients who might require computer system services.

In a September 25, 2014 email to an executive at AT&T, Boutte confirmed formation of a partnership with Mitchell, writing "though we have not signed any contracts, [Mitchell] and I are in an agreement with moving forward in a partnership."

Originally, the partnership was limited to Mitchell and Boutte. A few weeks later, the men explored the possibility of including Karaka and PCB in the partnership. The three men met in New Brunswick on October 17, 2014, to discuss "form[ing] a joint venture." At the meeting, the three men agreed each would invest $100,000 in capital toward the joint venture. In an October 18,

---

[2] Karaka's company is PCB.

[3] Boutte's company is defendant Nola Business Solutions, Inc. (Nola).

2014 email recapping the meeting, Boutte wrote, "we all agree that we will move towards a joint venture[,]" and "[a]ll three parties will share equally on an opportunity's net profit." At trial, Mitchell took the position this email formed the joint venture agreement.

In November 2014, Boutte sent an email referring to PCB and plaintiff as "core partners of Nola." In late November 2014, the three men exchanged emails regarding the partnership. Mitchell emailed Boutte and Karaka, stating he wanted to "get up to speed on . . . finalizing our legal agreement." Karaka agreed it was "a good idea to complete the business plan," and he circulated a "proposed final agreement for the consortium."

However, Karaka's draft document differed from the agreement discussed among the three men on October 1, 2014. For example, the effective start date of the joint venture changed from October 2014 to January 15, 2015. In addition, the draft document proposed the "shareholding" date would commence in April 2015. Additionally, the three men would buy into Nola in April, instead of fronting the $100,000 capital investment immediately. Mitchell disagreed with the proposed changes in the draft document. As a result, Boutte and Karaka prepared a second draft document to address Mitchell's concerns.

A-1612-19

On January 15, 2015, the three men again discussed the "joint venture agreement." Mitchell expressed concern over the lack of immediate payment of the capital investment, stating he and Kavaka were carrying significant costs without financial assistance from Boutte. Boutte and Karaka decided to draft a more "equitable" agreement.

Mitchell continued to disagree with the proposal because the terms identified plaintiff as working for Nola rather than serving as Nola's partner. Mitchell, expecting to receive a "partnership document," believed the document did not memorialize the terms of the joint venture agreement.

In late January 2015, the three men resumed discussions to finalize the joint venture agreement. Mitchell sought to form a limited liability company (LLC) in which the three men would be shareholders in the LLC. Boutte explained he was unable to convert Nola into an LLC.

On February 1, 2015, the men had a telephone conference to discuss the status of the joint venture. Boutte noted Mitchell's disapproval of the proposed payment structure and invited Mitchell to present a counterproposal. Mitchell wanted to implement the plan outlined during the October 17, 2014 meeting and memorialized in the October 18, 2014 email, which he claimed called for sharing "gross profit" equally.

A-1612-19

Three days later, Mitchell sent an email to Karaka, asking if Karaka finished drafting the "consortium agreement." On February 27, 2015, Karaka sent a revised agreement that included a capital contribution in the amount of $400,000 instead of $100,000 and spread the payment over time rather than an initial lump sum payment. Because he never discussed the increased capital contribution, Mitchell deemed the revised document "unacceptable."

Mitchell requested the original agreement set forth in the October 18, 2014 email be effectuated. Boutte and Karaka preferred the new proposal. While the men had further discussions regarding a joint venture, there was never a formal written agreement.

On March 6, 2015, Boutte sent an email to Mitchell regarding receipt of payment from AT&T for work performed by the group. Boutte asked Mitchell to sign a sales commission agreement in order to pay plaintiff for its share of the work.

Although Mitchell agreed to return a signed copy of the agreement, he did not do so. Mitchell refused to sign the sales commission agreement, reiterating he wanted to proceed with the joint venture as stated in the October 18, 2014 email.

A-1612-19

Mitchell testified the three men continued working despite their disagreements related to the joint venture. According to Mitchell, he remained "actively involved," planning and performing billable work on behalf of the joint venture.

Soon after, Mitchell decided to end his involvement with the other men. On March 27, 2015, Boutte again requested Mitchell sign the sales commission agreement. In a March 27, 2015 email, Mitchell declined to sign the document, writing "[Boutte] and [Karaka] can partner on this opportunity going forward." After this date, plaintiff did not perform any work for Berry. While Mitchell had no desire to help Boutte and Karaka going forward, he "expected to be paid for the work . . . already done," including the work to establish the joint venture and completed for Berry. Mitchell never spoke with Boutte or Karaka after the March 27 emails.

At trial, Mitchell testified as to the amount defendants owed plaintiff. Mitchell explained PCB billed Berry a total of $5,601,825 and Nola billed Berry a total of $1,157,255. According to Mitchell's calculations, under the joint venture agreement, plaintiff was owed a one-third share of thirty percent of the amount billed by PCB and Nola. Thus, Mitchell testified defendants owed $675,908 to plaintiff.

On cross-examination, Mitchell testified the October 2014 joint venture agreement was controlling despite his failure to tender the required $100,000 capital contribution. He supported this contention by explaining neither Boutte nor Karaka made the $100,000 investment in the joint venture.

Regarding plaintiff's damages, Mitchell testified the October 2014 proposal called for thirty percent of gross revenue to be split evenly among the three partners. According to Mitchell, the thirty percent figure was an accurate estimate of the partnership's actual profit and was the standard markup for plaintiff's work prior to participating in the joint venture. Mitchell, however, admitted his damages calculation included revenue received nearly three years after his decision to leave the joint venture.

Mitchell explained the October 18, 2014 email, stating the three men would share the "net profit" rather than "gross profits," was subsequently clarified. However, he conceded there was no writing reflecting any such clarification. According to Mitchell, plaintiff worked for Berry three months prior to any discussion regarding a joint venture, and plaintiff was owed money for that work.

Mitchell indicated the October 18, 2014 email served as the written agreement for the joint venture and there was no formal memorialization of "all

9

the finite details." According to Mitchell, the email did not include "everything" discussed during the October 2014 face-to-face meeting, such as the required "monetary contribution." Mitchell claimed he did not respond to the October 18, 2014 email because he "trusted" Boutte and Karaka and believed the parties had a "verbal" agreement.

During his testimony, Mitchell included sums in his damages calculation for work billed to AT&T that failed to net any profit. Similarly, Mitchell's damages included bills submitted to AT&T without any markup, resulting in zero profits on those billed services.

Testimony of Nag Karaka

Karaka testified he intended to form a joint venture with Mitchell. In October 2014, Karaka, Boutte, and Mitchell sought to form a joint venture to conduct work for Berry and pursue work on behalf of other clients. According to Karaka, Mitchell would supply a client list and technical know-how for the joint venture. He also testified the costs associated with the joint venture would be split three ways.

Karaka's company, PCB, billed Berry a total of $5,545,390.08. PCB also billed $967,703.03 to Nola for work on behalf of Berry. However, PCB only received $5,164,989.53 for its Berry work.

10

Karaka explained he worked for AT&T as a "solutions architect." After leaving AT&T, Karaka formed PCB. PCB's services included selling, implementing, and supporting software solutions for other companies.

Karaka and PCB first worked with Mitchell in 2013 as a subcontractor for plaintiff. The two companies worked well together, and Karaka had a "great" relationship with Mitchell.

Karaka told the jury about the face-to-face meeting with Mitchell and Boutte on October 17, 2014. At the meeting, Karaka, Boutte, and Mitchell discussed a partnership. He described the meeting as informal and explained nothing was decided at the meeting. According to Karaka, the three men never agreed to a three-way split of thirty percent of the gross profit and did not discuss a per person capital contribution of $100,000 to fund the joint venture.

Immediately after this meeting, Boutte sent an email summarizing the discussions and identifying the next steps in the joint venture process. The summary did not include capital contributions or sharing thirty percent of gross profits. Karaka believed Boutte's email accurately reflected the sharing of "net profits" among the parties.

According to Karaka, Mitchell never said he considered Boutte's October 18, 2014 email to be the joint venture agreement. Karaka explained the men

11

"were still discussing" and never finalized any agreement.  Despite the lack of a formal agreement, the three men continued discussing a joint venture and working together.

Regarding Mitchell's March 27, 2015 email, Karaka understood Mitchell no longer wished to be part of a joint venture or work for Berry.  Karaka never heard from Mitchell after this email.

Without plaintiff's participation, Karaka and Boutte continued working for Berry.  Plaintiff was not involved in work for Berry or any other joint venture clients after March 2015.

Karaka testified regarding payment received by PCB for the Berry work. PCB received $5.1 million in total payment from Berry, not $5.5 million as Mitchell alleged.  Contrary to Mitchell's testimony, Karaka explained PCB did not receive a thirty percent gross profit margin.  According to Karaka, PCB lost money for the first five months due to substantial startup costs.  He explained PCB lost "a little more than" a "quarter of a million dollars" in that time frame. Karaka testified PCB made approximately $25,000 in total profits from the Berry work, significantly lower than the $675,000 amount plaintiff sought as its one-third share of the profits.

A-1612-19

Karaka testified PCB, through Nola, received payment for various Berry work between January and March 2015 to mid 2019. PCB received $10,914 a month for its work during this time period.

Karaka was asked why PCB continued to work with Berry if its profit margin was so small. Karaka replied that some of the work was unexpected and future projects, which PCB anticipated would be more profitable, were cancelled.

Testimony of Bryan Boutte

Boutte explained his initial introduction to plaintiff. Boutte's prior employer did a substantial amount of work for AT&T and Berry. Because Boutte's employer needed a specific software program specialist to complete the Berry work, plaintiff became a vendor for the project. Mitchell served as a project manager, but plaintiff required more manpower to complete the job, and Mitchell hired PCB to assist plaintiff.

Believing his prior employer was squandering business opportunities, Boutte sought to foster his own business relationship with AT&T and mentioned the idea to an AT&T employee. The AT&T employee encouraged Boutte to form his own company and partner with AT&T. In September 2014, Boutte formed Nola.

A-1612-19

Boutte told Mitchell about his forming Nola, but Mitchell initially had no interest in partnering with Nola. When Boutte again discussed the business, emphasizing Nola's relationship with AT&T, Mitchell became interested. Mitchell suggested including PCB as part of a business opportunity.

On October 4, 2014, Boutte and Mitchell signed a letter of intent. Five days later, Boutte and Karaka signed a letter of intent. The letters of intent protected confidential and proprietary information and explained the parties were exploring a partnership. The documents explicitly stated no party was obligated to enter into an agreement. The documents further provided, "This letter sets forth the entire agreement of the parties . . . and may not be amended or modified except pursuant in a written agreement signed by the parties hereto." According to Boutte, this provision meant any agreement to form a partnership required a signed written contract.

On October 17, 2014, Boutte, Karaka, and Mitchell met face-to-face in New Brunswick. Boutte characterized the meeting as an informal "discussion" with "lively ideas going back and forth." According to Boutte, the men made "some decisions that we said we wanted to put in process" but no "business relationships" were "consummated." As a result of this meeting, the three men agreed to work toward "putting together something" and everyone would be paid

14

equally. Because the agreement was "no[t] set in concrete," Boutte explained further discussion was required to "flesh it out." Boutte intended to schedule future "periodic meetings" related to the partnership.

Immediately after the meeting, Boutte sent the October 18, 2014 email, summarizing the discussions during face-to-face gathering. The email provided "action items," describing the next steps in the partnership. The "major" action items according to the email included moving towards a "joint venture model," fleshing out the model, and testing the model. The model contemplated the three men acting as vendors, becoming Nola shareholders, or forming a separate company.

In the October 18, 2014 email, Boutte stated "net profits" would be split among the partners, with "net profits" meaning revenue minus expenses. According to Boutte, the term "gross profits" was omitted from the email because it was never discussed during the in-person meeting. Nor was there any mention of capital contributions during the meeting.

Boutte's October 18, 2014 email also included items not discussed as part of the face-to-face meeting. Boutte included the items because he believed the additional terms were important for a partnership structure. One addition was the creation of a "Master Services Agreement," identifying the mechanism for

15

Nola's payment to PCB and plaintiff because those parties were incurring costs and fronting resources for the partnership.

Boutte testified the email summary was not intended to memorialize a joint venture agreement but rather a recitation of statements made during the face-to-face meeting. Neither Karaka nor Mitchell responded to Boutte's October 18, 2014 email.

In a November 3, 2014 email to Karaka and Mitchell, Boutte set forth the next steps in formulating the partnership, trying to "document as much as possible" in the email. While the three men continued to discuss forming partnership, no agreement was reached on the issue.

Eventually, Nola placed a vendor with a client through PCB, generating revenue for Nola. As a result, Boutte wanted to pay plaintiff, and he forwarded a sales commission agreement to be signed by Mitchell.[4] Mitchell claimed his attorney needed to review the agreement.

Boutte subsequently received an email from Mitchell's attorney, who advised that Nola should be converted into an LLC. Boutte explained he formed Nola as a corporation and did not want to convert the entity to an LLC.

---

[4] Boutte sent a similar agreement to PCB. Karaka signed the agreement on behalf of PCB and returned the document to Boutte.

Moreover, Boutte found the suggestion premature as the three men were still discussing the best option for formal ownership in the joint venture.

In March 2015, Boutte again asked Mitchell to sign the sales commission agreement so he could pay plaintiff for the AT&T work. Mitchell claimed he would forward the signed agreement but never did.

Boutte had discussions with AT&T regarding a new work proposal with Mitchell serving as a program manager for the technical work. An AT&T employee told Boutte to remove Mitchell from the proposal but did not explain the reason for the request. Boutte suspected AT&T had doubts about Mitchell and plaintiff's work performance.

In March 2015, Berry decided to stop working with Mitchell. Later that month, Boutte sent another copy of the sales commission agreement to Mitchell to sign. In a March 27, 2015 email, Mitchell declined to sign the agreement and stated Boutte and Karaka could "partner on this opportunity going forward." According to Boutte, the "opportunity" referred to work for AT&T and Berry. After the March 27 email, Boutte did not hear from Mitchell, and plaintiff was never a part of the joint venture.

Boutte denied agreeing to pay plaintiff a third of gross profits or revenues generated. Boutte testified the joint venture proposed splitting net profits evenly

17

among the three men. He also testified there was never a joint venture to support plaintiff's damages claim.

According to Boutte, there was a "gentlemen's agreement" to "be partners in pursuing opportunities." Boutte testified:

> [T]here was a target towards developing a joint venture. We had not and never had developed a joint venture. We had an agreement that said we would continue to work together and actually mapped out a three[-]phase approach. This was phase one that says we can work together[,] and we had an understanding that if these opportunities came to fruition without having investment in either one's company, that we would share the profits regardless of who was doing the implementation.

On February 23, 2017, nearly two years after Mitchell's email declining to pursue a partnership opportunity, Mitchell sent an email to Boutte. In that email, Mitchell claimed, "although we never finalized the agreement," plaintiff still expected payment from the "Berry Plastics Consortium." The email surprised Boutte because Mitchell opted out of the potential joint venture on his own accord.

During cross-examination, Boutte explained he never offered to invest $100,000 as a capital contribution to persuade Mitchell to partner in the joint venture. However, Boutte conceded the three men discussed contributing $100,000 each to capitalize the joint venture.

18

<u>Testimony of Debbie Garrison</u>

Debbie Garrison, who worked at Berry, testified on behalf of defendants. Garrison knew plaintiff and Mitchell. Garrison initially recommended Mitchell as a project manager for Berry. However, neither plaintiff nor Mitchell signed a contract with Berry.

Plaintiff worked for Berry in its Belgium office. After completion of this work, Berry declined to use plaintiff for future work. Garrison received several complaints regarding Mitchell's work and contacted AT&T for advice. AT&T recommended Berry use a different project manager as a result of the complaints. Berry ceased working with plaintiff in March 2015.

<u>Testimony of Anthony Pedano</u>

Anthony Pedano, an AT&T employee, testified for defendants. Pedano first met Mitchell in 2014 because AT&T needed to replace an existing project team. AT&T had no intention of hiring Mitchell or plaintiff, and only interacted with plaintiff as a "vendor."

Pedano knew Boutte, and the two discussed Boutte's business. It was Pedano who suggested Boutte name his company "Nola." Nola and AT&T entered into a separate vendor agreement that did not involve Mitchell or his company.

19

After plaintiff completed the initial vendor work for AT&T, Pedano mentioned using Mitchell and his company on future projects with Berry. Pedano learned Berry sought to discontinue using plaintiff and Mitchell due to "personality conflicts that were developing on the project team." According to Pedano, Garrison recommended AT&T cease using plaintiff.

The Litigation

Believing a joint venture agreement existed, plaintiff sued PCB and Karaka for breach of the agreement. Plaintiff amended its complaint to add a claim against Nola for breach of the agreement. In a third amended complaint, plaintiff added claims against defendants for tortious interference, unfair competition, and breach of the joint venture. Defendants filed answers and counterclaims.

Disputes arose during discovery requiring judicial resolution. In an October 12, 2018 order, the motion judge denied plaintiff's motion to compel the production of documents regarding revenue generated by PCB and Nola.[5] Plaintiff filed a motion for reconsideration or clarification regarding the October 2018 discovery order. In a November 21, 2018 order, the motion judge compelled defendants to produce certain records. However, nothing in the

---

[5] Plaintiff's motion requested "actual QuickBooks Reports as to expenses."

language of the November 2018 order compelled defendants to produce expense back-up documents.[6]

In January 2019, plaintiff filed a motion to enforce the November 2018 discovery order. Plaintiff claimed defendants produced document summaries rather than original documents. During argument on plaintiff's discovery motion, the motion judge found plaintiff's request "to get every last back up document" was "oppressive." In an effort to end discovery motion practice, the motion judge signed a January 25, 2019 order requiring plaintiff to select ten documents "at random" from PCB's expense report and compelling defendants to supply the original statements of work (SOW) between Berry and PCB for the selected documents. According to the judge, if the documents matched the summaries, the issue would be resolved. In the event the documents did not match the summaries, plaintiff could return to court for additional relief.

In February 2019, PCB produced the back-up documents for the ten selected items from the expense reports, as well as the other documents to be produced pursuant to the January 2019 order.

---

[6] Significantly, plaintiff's counsel prepared the form of the November 2018 order. If plaintiff sought statements of work, as it argues on appeal, there is no mention of such documents in the order.

After receiving the back-up documents, plaintiff again moved to compel the production of documents. In a March 26, 2019 order, the judge denied the motion, noting, "If the plaintiff is able to demonstrate at trial that the [d]efendant has intentionally withheld discoverable documents, the [p]laintiff may seek from the trial judge a jury instruction for a negative inference."

After the completion of discovery and adjournment of several trial dates, trial was scheduled for September 2019. Prior to the start of trial, the trial judge entertained several motions.

Plaintiff filed a motion on the eve of trial to amend its complaint to include claims for fraudulent concealment and spoliation. The judge denied the motion, finding a request to amend the complaint to add new causes of action two days before the start of trial was prejudicial to defendants. The judge explained it would be inappropriate to allow plaintiff to "completely expand the scope of what the trial would be addressing . . . with no opportunity for the defense to engage in further discovery . . . ." Further, the judge stated there was more than ample time for plaintiff to have sought to amend its complaint earlier based on the five extensions of discovery and five adjournments of the trial. She also noted plaintiff never moved to reopen discovery to assert the new claims or file

22

a motion for sanctions against defendants based on the alleged withholding of discovery.

In denying the request to add a claim for spoliation of evidence, the judge found plaintiff could not meet the "spoliation factors under a [Rule] 4:62 analysis . . . ." Regarding plaintiff's request for an adverse inference based on defendants' purported withholding of discovery, the judge concluded the claim was "not supported in this record and it would be improper for the [c]ourt to permit that." Rejecting plaintiff's request to add a claim for fraudulent concealment, the judge noted fraud must be pleaded with specificity and "there is not that specificity here."

In another pretrial motion filed by plaintiff, the judge denied a request to allow Mitchell to "testify as to certain gross profit per hour figures in terms of trying to come up with damages calculations . . . to posit for the jury . . . ." In a related pretrial motion on behalf of defendants, the judge "bar[red] plaintiff from being able to be presented as an expert on the issue of damages." The judge deemed any testimony by Mitchell related to a thirty-eight percent profit margin was "clearly within . . . the purview of an expert . . . to go through how PCB arrived at . . . their gross profit and the amounts by which . . . to do that calculation."

A-1612-19

After deciding the pretrial motions, the matter was tried before a jury over the course of eight days, starting on September 9, 2019 and ending on September 19, 2019.

After the close of plaintiff's case, PCB and Nola moved for a directed verdict under Rule 4:37-2. The judge partially granted defendants' motions for a directed verdict, dismissing counts five and six, alleging unfair competition. However, the judge allowed plaintiff to proceed on its claims for breach of contract based on the existence of a joint venture. According to the judge, "it's going to be for the jury's consideration as to what they can glean from the evidence constituted the material terms . . . of that joint venture in the event that they find one existed."

At the close of the evidence, defendants moved for judgment under Rule 4:40. After hearing argument on the motion, the judge reserved, explaining the rule provides a judge "can submit all issues to the jury and then if [the judge] believes that there is an error with respect to what should have gone before them, [the judge] can correct [any issues] within [ten] days of receiving a verdict . . . ."

The judge conducted a charge conference with counsel and then charged the jury accordingly. After receiving the judge's instructions, the jury deliberated on plaintiff's remaining claims.

During deliberations, the jury submitted several written questions to the judge. The first question read: "Do damages have to be calculated on numbers as evidenced or based on the jury's calculation of fairness?" After consulting with counsel, the judge reread the sections of the jury charge germane to damages calculations.

The second jury question, submitted in three parts, read: "Are we permitted to include damages? What are damages? Legal fees?" Because the judge and counsel were confused as to the meaning of these three questions, the judge asked the jury to return to the deliberation room and clarify their questions. After the jury discussed their questions outside the presence of the judge and counsel, the jury returned to the courtroom, and the judge asked the jury foreperson for clarification. The foreperson replied, "We wanted to know what the definition of damages is." The judge repeated the jury charges governing damages. The judge also explained plaintiff asserted no claim to legal fees in this case and the jury should not consider legal fees.

The jury rendered a verdict on September 19, 2019. By unanimous vote, the jury found plaintiff proved there was a joint venture between plaintiff, PCB, and Nola, and plaintiff "performed pursuant to the terms of the joint venture agreement." In addition, the jury unanimously found PCB and Nola breached their obligation to plaintiff, and the breach resulted in damages. By a five to one vote, the jury awarded damages to plaintiff in the amount of $177,000.

On October 25, 2019, the judge heard post-trial motions. Plaintiff moved for additur or, alternatively, a new trial. PCB moved for a judgment under Rule 4:40 or, alternatively, remittitur. The judge denied the requests for additur and remittitur, noting additur or remittitur required an agreement between the parties and they did not agree.

In denying plaintiff's motion for a new trial limited to damages, the judge found the jury's verdict was "not shocking to the [c]ourt's conscience." She explained "[i]t [was] well within [the jury's] purview to have listened to the evidence, made determinations on what they feel there was agreement on, to balance the equities in terms of their assessment of what the proofs were relative to damages and to reach . . . a calculation with respect to damages that was acceptable and just to them." Additionally, she noted "ambiguity" in the record regarding damages and indicated "there [was] nothing off of this very . . .

26

substantial trial record, that would cause the [c]ourt to find that the high standard for a [m]otion for a [n]ew [t]rial with respect to damages has been reached."

The judge also denied PCB's renewed Rule 4:40 motion, focusing on "the factors necessary for plaintiff to establish a prima facie case for a joint venture." She concluded giving plaintiff "the benefit of all evidence that can be gleaned in the record . . . . the jury had the ability to look at all [the] factors and to properly adjudicate the issue of whether they believed plaintiff had proven the establishment of a joint venture . . . ." The judge stated, "[T]he jury listened attentively for a long time with respect to a lot of conflicting evidence and did a yeoman's job of being able to come to a resolution that they felt was justified within the record."

On appeal, plaintiff challenges various pre-trial and post-trial orders issued by the court, arguing the judges erred with respect to their rulings. In addition, plaintiff argues it is entitled to additur or, alternatively, a new trial as to damages only. We reject plaintiff's arguments.

We first address plaintiff's challenge to the pretrial discovery orders. We review discovery orders for abuse of discretion. Capital Health Sys., Inc. v. Horizon Healthcare Servs., Inc., 230 N.J. 73, 79-80 (2017). "[A]ppellate courts are not to intervene but instead will defer to a trial judge's discovery rulings

absent an abuse of discretion or a judge's misunderstanding or misapplication of the law." Id. at 78-79 (citing Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)).

Here, we discern no mistake of law or abuse of discretion regarding the motion judge's discovery orders. Plaintiff and defendants sought judicial resolution of discovery disputes concerning defendants' disclosure of documents related to plaintiff's damages claim. After presiding over three separate motions related to plaintiff's continued demands for documents, the motion judge characterized plaintiff's third motion as "oppressive" in that plaintiff sought to obtain "every last back up document."

As the trial judge aptly noted, the motion judge made a "Solomon"-like decision to resolve the parties' discovery issues. The judge ordered plaintiff to select ten documents "at random" from PCB's expense report and compelled defendants to supply the original SOW for the selected documents. The motion judge found PCB complied with the January 25, 2019 order.

We defer to the motion judge's discovery rulings. Plaintiff failed to explain how production of every single SOW and supporting backup documentation were required to support its damages calculation. Moreover, nothing precluded plaintiff from issuing subpoenas to obtain the information

from the entities who were billed for work performed by defendants. On this record, we discern no abuse of discretion or misapplication of the law regarding the motion judge's discovery orders.

Plaintiff also argues the trial judge erred in denying its motions in limine. We review a trial court's grant or denial of an in limine motion for abuse of discretion. Brenman v. Demello, 191 N.J. 18, 31 (2007).

We reject plaintiff's argument that PCB's failure to produce every SOW, despite PCB's compliance with the court's discovery orders, entitled it to a spoliation inference. As the trial judge explained, the parties were engaged in "legitimate and ongoing and repeated discovery disputes . . . ." She concluded defendants complied with the discovery orders and plaintiff's requests were "not substantiated in the record." As a result, no discovery sanctions were warranted, and the trial judge properly denied plaintiff's motion in limine.

We next review plaintiff's contention the trial judge erred in precluding Mitchell from testifying as to plaintiff's entitlement to a thirty-eight percent gross profit in support of plaintiff's damages calculation. We review a trial court's decision to admit or exclude evidence for abuse of discretion. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). Appellate courts will not disturb a trial court's evidentiary rulings unless they are "so wide

off the mark that a manifest denial of justice resulted." Green v. N.J. Mfrs. Ins. Co., 160 N.J.480, 492 (1992) (quoting State v. Carter, 91 N.J. 86, 106 (1982)). at 492.

Here, the trial judge found Mitchell lacked personal knowledge of the joint venture's gross profits to allow him to testify plaintiff was entitled to a specific percentage of defendants' gross profits. See N.J.R.E. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter . . . . This rule does not apply to expert testimony under Rule 703.") At trial, Mitchell testified as a fact witness. He was never qualified as an expert witness. Nor is there anything in the record supporting Mitchell's personal knowledge of the joint venture's profits. To the contrary, Karaka testified the joint venture had a significantly lower gross profit rate or lost money on the work performed by it. Based on this record, we discern no abuse of discretion in excluding Mitchell's testimony suggesting a thirty-eight percent gross profit on the work performed by the joint venture.

We next review plaintiff's argument the trial judge erred in denying its motions to amend the complaint. We recognize "Rule 4:9-1 requires that motions for leave to amend be granted liberally" in the interest of justice, and

"the granting of a motion to file an amended complaint always rests in the court's sound discretion." Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 457 (1998). However, trial courts are free to deny leave to amend a pleading on the eve of trial. Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J. Super. 160, 195 (App. Div. 2006) (citing Pressler & Verniero, Current N.J. Court Rules, cmt. 2.2.2 on R. 4:9-1 (2021)). In addition, leave to amend is properly denied where "allowing the amendment would unduly protract the litigation or cause undue prejudice." Pressler & Verniero, Current N.J. Court Rules, cmt. 2.2.1 on R. 4:9-1 (2021) (citing Cutler v. Dorn, 196 N.J. 419, 441 (2008)).

Applying these principles, there is no basis to disturb the trial judge's denial of plaintiff's motion to amend the complaint. Plaintiff sought leave to amend its pleading two days prior to the start of the trial after several discovery extensions and numerous adjournments of the trial date. Further, plaintiff's proposed amended pleading asserted brand new claims against defendants. The trial judge properly denied leave to amend, finding the newly added claims, raised just before trial, were prejudicial to defendants because defendants would have to defend the claims absent discovery and without adequate time to prepare a defense.

Plaintiff also claims its motion for additur should have been granted or, alternatively, a new trial on damages only should have been ordered. We disagree.

"A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). To overcome "[t]he presumption of correctness that attaches to a damages award[,]" the party moving for a new trial or additur must "establish, 'clearly and convincingly,' that the award is 'a miscarriage of justice.'" Ibid. (quoting Baxter, 74 N.J. at 596).

We review a damages award employing the same standard as the trial court, "with one exception–an appellate court must pay some deference to a trial judge's 'feel of the case.'" Ibid. (quoting Johnson v. Scaccetti, 192 N.J. 256, 282 (2007)). We do not disturb the jury's award "unless it is 'so disproportionate to the injury . . . as to shock the conscience and [convince the court] that to sustain an award would be manifestly unjust.'" Ming Yu He v. Miller, 207 N.J. 230, 249 (2011) (quoting Baxter, 74 N.J. at 604). "[T]he evaluation of damages is a matter uniquely reposed in the jury's good judgment, and to justify judicial interference, '[t]he verdict must be "wide of the mark" and pervaded by a sense

of "wrongness."'" Jastram ex. rel Jastram v. Kruse, 197 N.J. 216, 229 (2008) (second alteration in the original) (quoting Johnson, 192 N.J. at 281).

"The standard of review on appeal from decisions on motions for a new trial is the same as that governing the trial judge–whether there was a miscarriage of justice under the law." Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 522 (2011) (citing Bender v. Adelson, 187 N.J. 411, 435 (2006)). A court is not required to grant a motion for a new trial because a party complains the damages award is too small. Anderson v. A.J. Friedman Supply Co., 416 N.J. Super. 46, 71-72 (App. Div. 2010).

Applying these standards, we are satisfied the trial judge correctly denied plaintiff's motion for a new trial on damages. The judge summarized the divergent testimony concerning plaintiff's damages and explained the jury found no single witness credible on the issue of damages. The judge noted plaintiff sought damages over a five-year period despite defense testimony and evidence indicating plaintiff ended its relationship with the joint venture five months after the initial face-to-face meeting. Further, there was conflicting testimony regarding plaintiff's entitlement to a share of gross profits versus net profits and how profits would be calculated.

33

We also reject plaintiff's contention the jury was confused in calculating the damages award. "Once the jury is discharged, both trial and appellate courts are generally bound to respect its decision, lest they act as an additional and decisive juror." Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 135-36 (1990) (citing Dolson v. Anastasia, 55 N.J. 2, 6 (1969)). "The jury's views of the facts and the credibility of the witnesses as expressed in its verdict are entitled to deference from both the trial and appellate courts." He, 207 N.J. at 251-52. We do not reweigh the evidence and substitute our judgment for that of the jury. See Jastram, 197 N.J. at 235.

Similarly, we decline to decipher the jury's logic or rationale in awarding damages based purely on the jury's written questions to the court. Plaintiff offers only speculation and conjecture as to the meaning of the jury's written questions. Plaintiff's damages claim was multifaceted and vigorously disputed by defendants. There is no evidence in the record the jury misunderstood the evidence or judge's instructions in arriving at the damages award. The judge consulted with counsel prior to responding to the jury's questions and re-read the charges regarding the calculation of damages. There is no merit to plaintiff's argument the jury was confused about damages based on their written questions.

Further, the jury clearly rejected many components of plaintiff's claim for damages based on the evidence and testimony. The jury rendered credibility determinations and reviewed the evidence. In discharging its duty, we do not second-guess the jury's credibility assessments or weigh the persuasiveness of the evidence presented. A reasonable jury could accept the testimony and evidence to determine the sum of $177,000 properly compensated plaintiff for its damages. While plaintiff sought a much larger award, the amount awarded is supported by the record based on the jury's considered evaluation of the conflicting evidence and their credibility determinations regarding the various witnesses. Under the circumstances, we agree the jury's award did not shock the judicial conscience, and we perceive no basis to interfere with the damages award.

For the same reason, we affirm the trial judge's denial of plaintiff's motion for additur. See City of Long Branch v. Jui Yung Liu, 203 N.J. 464, 492 (2010) (applying to motions for additur the same standard for new trial motions based on a claim the damages award is against the weight of the evidence); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:49-1(a) (2021) ("[N]either additur nor remitter can be ordered unless a new trial, at least on the damages issue, would be warranted.")

We next consider PCB's cross-appeal. PCB argues the jury award should be vacated and plaintiff's claims dismissed. In the event this court declines to dismiss plaintiff's claims, PCB asserts the jury's award should stand. We reject PCB's argument for dismissal of plaintiff's claims and affirm the jury's damages award.

A motion for judgment may be made at the close of plaintiff's case, Rule 4:37-2(b), or after the verdict, Rule 4:40-1. We review motions under both rules applying the same standard as the trial court. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). Both motions are governed by the same standard: "[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according [it] the benefit of all inferences which can reasonably and legitimately be deduce therefrom, reasonable minds could differ, the motion must be denied." Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)). A motion made under either rule "should only be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008) (citing Pitts v. Newark Bd. of Educ., 337 N.J. Super. 331 (App. Div. 2001)).

In rendering the verdict, the jury found plaintiff performed in accordance with the terms of the joint venture. Despite the lack of capital contributions by the three men, the jury heard testimony the parties worked together pursuing business opportunities, and plaintiff carried significant costs as part of the joint venture. The jury also heard testimony indicating the exact terms of the joint venture were fluid and subject to frequent changes. Therefore, the jury could have credibly concluded plaintiff performed in accordance with the terms of the joint venture absent a formal written agreement and without payment of a $100,000 capital contribution by each partner. Because none of the partners tendered money as part of a capital contribution toward the joint venture, the jury could have determined such payment was not a material term in forming the joint venture.

Additionally, plaintiff presented evidence of damages stemming from the joint venture. Mitchell testified the parties agreed to split gross profits three-ways, while defendants denied any such agreement. Further, plaintiff admittedly never received payment for work performed by the joint venture between October 2014 and March 2015 despite the partnership's receipt of payment from AT&T for work during that time period. Giving plaintiff every

favorable inference, we are satisfied the trial judge properly denied defendants' motions to dismiss.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1612-19